No. 19-1044

_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

In re PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY
and HAWAII COALITION MALAMA PONO,
*Petitioners*.

_____

On Petition for Writ of Mandamus

_____

**RESPONSE OF THE FEDERAL AVIATION ADMINISTRATION
AND THE NATIONAL PARK SERVICE
IN OPPOSITION TO THE PETITION**

_____

Of Counsel:


MICHAEL FINEMAN
CATHERINE BASIC
*Attorneys*
Office of the Chief Counsel
Federal Aviation Administration


SARA PORSIA
*Attorney*
Office of the Solicitor
U.S. Department of the Interior

JEFFREY BOSSERT CLARK
*Assistant Attorney General*
ERIC GRANT
*Deputy Assistant Attorney General*
ANDREW C. MERGEN
ELLEN J. DURKEE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-4426
ellen.durkee@usdoj.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), undersigned counsel certifies as follows:

### A.     Parties and Amici

All parties, intervenors, and amici appearing before this Court are listed in petitioners Certificate as to Parties, Rulings, and Related Cases in the Addendum (at i) to the Petition.

### B.     Rulings Under Review

There are no agency orders or rulings under review.  Petitioners allege unreasonable delay by the Federal Aviation Administration ("FAA") and the National Park Service ("NPS") and seek a writ of mandamus.

### C.     Related Cases

In October 2017, petitioners filed a complaint against FAA in district court seeking relief similar to that which they seek in the current petition.  *Public Employees for Environmental Responsibility v. FAA*, No. 1:17-cv-02045 (D.D.C.). After FAA moved to dismiss the case for lack of jurisdiction (based on 49 U.S.C. § 46110), petitioners voluntarily dismissed that action in January 2018.

In February 2018, petitioners filed a petition for a writ of mandamus in this Court seeking relief against FAA similar to that which they seek in the current petition.  *See In re Public Employees for Environmental Responsibility*, D.C. Cir.

No. 18-1044 (filed Feb. 14, 2018).  In an order dated November 13, 2018, that

petition was dismissed for lack of Article III standing.

s/ Ellen J. Durkee
ELLEN J. DURKEE

Counsel for Respondents

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ...................................................................................i

TABLE OF AUTHORITIES ........................................................ vi

GLOSSARY ......................................................................... xii

INTRODUCTION ...................................................................1

STATEMENT OF JURISDICTION.............................................1

PERTINENT STATUTES ..........................................................3

STATEMENT OF THE CASE.....................................................3

    A.    Statutory background ..........................................................3

    B.    Factual background ............................................................7

        1.    Initial steps to implement the Act .............................7

            a.    Regulations ......................................................8

            b.    Establishment of Advisory Group ...................8

            c.    Memorandum of Understanding and Implementation Plan.........................................9

            d.    Issuance in 2005 of interim operating authority to existing operator applicants .........................9

        2.    Noise studies and modeling ....................................10

        3.    Efforts to develop air tour management plans for specific parks.........................................................10

        4.    After 2012, the agencies focused on implementing the amendments and the voluntary agreement process......................................................................11

a. Exemptions ...................................................................12

b. Voluntary agreements ...................................................12

c. Reductions in interim operating authority ......................13

5. The agencies' current near-term priorities focus on pursuit of voluntary agreements or plans or both in tandem at specific parks ...........................................14

SUMMARY OF ARGUMENT ..........................................................16

ARGUMENT .....................................................................................17

I. Mandamus is not available relief for petitioners' alleged injuries from delay in completion of plans or agreements. .........................17

II. Mandamus relief is not warranted. ................................................22

A. The Act does not impose the duties that petitioners allege ...................................................................................23

1. The Act imposes no mandatory deadline for completion of plans or agreements. ..........................23

2. One of the parks as to which petitioners seek mandamus relief is exempt from requirements relating to plans or agreements. ...............................25

B. Mandamus relief is not warranted under the *TRAC* factors. ...................................................................................26

1. The context and statutory scheme weigh heavily against granting the requested order. .........................28

2. Due consideration of agency priorities provides further reason to deny the requested mandamus relief. .....................................................................29

3. The third and fifth *TRAC* factors carry little weight in this case. ...................................................31

C.      The Court should exercise its equitable discretion to deny
        mandamus relief. ...............................................................................32

CONCLUSION ......................................................................................34

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Air Line Pilots Ass'n, International, Ltd. v. Civil Aeronautics Board*,
    750 F.2d 81 (D.C. Cir. 1984)...............................................................2

*American Hospital Ass'n v. Burwell*,
    812 F.3d 183 (D.C Cir. 2016)....................................................22, 23, 26, 27

*Citizens for Responsibility and Ethics in Washington v. Trump*,
    2019 WL 2261089 (D.C. Cir. 2019).......................................................22, 23

*City of Tacoma v. FERC*,
    460 F.3d 53 (D.C. Cir. 2006)............................................................2

*Cobell, et al v. Norton*,
    240 F.3d 1081 (D.C. Cir. 2001)........................................................26, 28

*Consolidated Edison Co. of New York, Inc. v. Ashcroft*,
    286 F.3d 600 (D.C. Cir. 2002)........................................................19, 20

*Custer County Action Ass'n v. Garvey*,
    256 F.3d 1024 (10th Cir. 2001) ........................................................2

*FCC v. Pottsville Broadcasting Co.*,
    309 U.S. 134 (1940)................................................................21

*Grand Canyon Air Tour Coalition v. FAA*,
    154 F.3d 455 (D.C. Cir. 1998)........................................................21, 32

*In re Aiken County*,
    725 F.3d 255 (D.C. Cir. 2013)........................................................34

*In re American Rivers & Idaho Rivers United*,
    372 F.3d 413 (D.C. Cir. 2004)........................................................27

*In re Barr Laboratories, Inc.*,
    930 F.2d 72 (D.C. Cir. 1991)........................................................23, 26, 30

*In re Bluewater Network*,
    234 F.3d 1305 (D.C. Cir. 2000)............................................................22, 33

*In re Center for Auto Safety*,
    793 F.2d 1346 (D.C. Cir. 1986).....................................................................33

*In re Core Communications, Inc.*,
    531 F.3d 849 (D.C. Cir.2008)........................................................................27

*In re Idaho Conservation League*,
    811 F.3d 502 (D.C. Cir. 2016).......................................................................17

*In re International Chemical Workers Union*,
    958 F.2d 1144 (D.C. Cir. 1992)....................................................................28

*In re: Public Employees for Environmental Responsibility*,
    D.C. Cir. No. 18-1044 ............................................................................i, 19

*Lexmark International, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)........................................................................................18

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).......................................................................................17

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
    336 F.3d 1094 (D.C. Cir. 2003)....................................................................27

*Missouri, Kansas & Texas Railway Co. v. May*,
    194 U.S. 267 (1904).......................................................................................21

*Norton v. Southern Utah Wilderness Alliance*,
    542 U.S. 55 (2004).........................................................................................19

*Organization for Competitive Markets v. U.S. Department of
    Agriculture*, 912 F.3d 455 (8th Cir. 2018)....................................................21

*Public Citizen Health Research Group v. Auchter*,
    702 F.2d 1150 (D.C. Cir. 1983)....................................................................31

*Public Employees for Environmental Responsibility*,
No. 1:17-cv-02045 (D.D.C.)..............................................................i

*13th Regional Corp. v. U.S. Dept. of Interior*,
654 F.2d 758 (D.C. Cir. 1980)................................................19, 32

*Sierra Club v. Thomas*,
828 F. 2d 783 (D.C. Cir. 1987)..............................................23, 30

*U.S. Ecology, Inc. v. U.S. Dept. of Interior*,
231 F.3d 20 (D.C. Cir. 2000).........................................................20

*Telecommunications Research & Action v. FCC* (*TRAC*),
750 F.2d 70 (D.C. Cir. 1984)...........................................2, 27, 33

*Wilbur v. United States*,
281 U.S. 206 (1930)......................................................................19

**Statutes**

Administrative Procedure Act
5 U.S.C. § 706(1) ................................................................20, 26

All Writs Act
28 U.S.C. § 1651(a) ........................................................................2

FAA Modernization and Reform Act of 2012, Pub. L. No. 112-95,
§ 501, 126 Stat. 11, 100-03 ............................................................6

National Environmental Policy Act
42 U.S.C. §§ 4321 et seq ...............................................................4

42 U.S.C. § 4332(2)(C) ..................................................................4

National Parks Air Tour Management Act of 2000

Pub. L. No. 106-181 §§ 801-809, 114 Stat. 61, 185-94
(codified as amended at 49 U.S.C. § 40128 and note) ........................3, 8, 18

49 U.S.C. § 40128(a)(2)(A)............................................................3

49 U.S.C. § 40128(a)(2)(D)..........................................................24

49 U.S.C. § 40128(a)(2)(E) ...........................................................24, 29

49 U.S.C. § 40128(a)(3) ...........................................................3

49 U.S.C. § 40128(a)(5) ...........................................................3

49 U.S.C. § 40128(a)(5)(A) ...........................................................7

49 U.S.C. § 40128(a)(5)(B) ...........................................................7

49 U.S.C. § 40128(b)(1)(A) ...........................................................3

49 U.S.C. § 40128(b)(1)(B) ...........................................................3, 18

49 U.S.C. § 40128(b)(2) ...........................................................4, 20

49 U.S.C. § 40128(b)(3) ...........................................................18

49 U.S.C. § 40128(b)(3)(A) ...........................................................4

49 U.S.C. § 40128(b)(3)(B) ...........................................................4

49 U.S.C. § 40128(b)(4) ...........................................................4

49 U.S.C. § 40128(b)(5) ...........................................................5

49 U.S.C. § 40128(b)(7)(A) ...........................................................6

49 U.S.C. § 40128(b)(7)(B) ...........................................................6

49 U.S.C. § 40128(b)(7)(C) ...........................................................6

49 U.S.C. § 40128(c)(1) ...........................................................5

49 U.S.C. § 40128(c)(2) ...........................................................5

49 U.S.C. § 40128(c)(2)(I) ...........................................................7, 14

49 U.S.C. § 40128(c)(3)(C) ...........................................................24

49 U.S.C. § 40128(d) ...........................................................7

49 U.S.C. § 40128(e) ....................................................................................3

49 U.S.C. § 40128(f) .................................................................................... 3

49 U.S.C. § 40128(g)(4)(A) ......................................................................8

49 U.S.C. §§ 40101-40104 .........................................................................5

49 U.S.C. § 46110(a) ..............................................................................1, 2

54 U.S.C. § 100101(a) ...............................................................................6

### Rules and Regulations

14 C.F.R. Part 136 (2018) ..........................................................................8

40 C.F.R. § 1508.9 ......................................................................................4

67 Fed. Reg. 65,662 (Oct. 25, 2002)..........................................................8

70 Fed. Reg. 36,456 (June 23, 2005) ..........................................................9

70 Fed. Reg. 58,778 (Oct. 7, 2005) ..........................................................10

70 Fed. Reg. 3972 (Jan. 27, 2005) ............................................................10

72 Fed. Reg. 6802 (Feb. 13, 2007) ...........................................................10

72 Fed. Reg. 6912 (Feb. 13, 2007) ............................................................8

83 Fed. Reg. 15,667 (Apr. 11, 2018) ........................................................12

## Legislative History

H.R. Rep. No. 106-167 (1999)........................................................4, 25, 32

S. Rep. No. 106-009 (1999) ......................................................................5

## Miscellaneous

https://www.whitehouse.gov/wp-content/.../CEQ-Timelines-
    Report.pdf ...................................................................................29

## GLOSSARY

| | |
|---|---|
| FAA | Federal Aviation Administration |
| NEPA | National Environmental Policy Act |
| NPS | National Park Service |

## INTRODUCTION

Petitioners Public Employees for Environmental Responsibility and Hawaii Island Coalition Malama Pono seek a writ of mandamus against the Federal Aviation Administration ("FAA") and the National Park Service ("NPS"). Petitioners allege that the two agencies have unreasonably delayed completion of air tour management plans or voluntary agreements under the National Parks Air Tour Management Act of 2000 ("Air Tour Management Act" or "Act"), 49 U.S.C. § 40128. Petitioners request an order directing FAA and NPS to complete plans for seven specified national parks within 24 months of such order, unless by that time voluntary agreements have been entered with all of the commercial air tour operators conducting tours over those parks.

The requested mandamus relief should be dismissed or denied because petitioners fail to demonstrate clear entitlement to such relief. Alternatively, the Court should exercise its discretion to deny mandamus because the agencies are making reasonable progress in implementing their statutory obligations. In particular, the agencies have recently agreed on a shift in approach and on near-term priorities and actions to further advance implementation.

## STATEMENT OF JURISDICTION

Courts of appeals have exclusive jurisdiction to review various orders issued by the FAA. 49 U.S.C. § 46110(a). Orders issued by the FAA under the Air Tour

1

Management Act come within the scope of that jurisdictional grant. This Court has held that a statutory commitment of exclusive jurisdiction in the courts of appeals to review an agency's orders, read in conjunction with the All Writs Act, 28 U.S.C. § 1651(a), affords this Court jurisdiction over petitions alleging that the agency has unreasonably delayed issuing such orders (provided that the petitions satisfy other jurisdictional requirements). *See, e.g., Telecommunications Research & Action v. FCC* ("*TRAC*"), 750 F.2d 70, 75-76 (D.C. Cir. 1984); *Air Line Pilots Ass'n, International v. Civil Aeronautics Board*, 750 F.2d 81, 84 (D.C. Cir. 1984).

Whether the Court's jurisdiction to order mandamus relief under the *TRAC* reasoning extends to NPS is an open question. We are unaware of any case in which this Court or any other court of appeals has ruled on whether *TRAC* can be extended to assume jurisdiction over an agency, such as NPS here, whose actions are not expressly subject to the exclusive jurisdictional provision. However, the Tenth Circuit has held that its jurisdiction to review an FAA order under 49 U.S.C. § 46110(a) permits concurrent review of subsidiary actions taken by other agencies to facilitate FAA orders. *E.g.*, *Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1027 (10th Cir. 2001); *cf. City of Tacoma v. FERC*, 460 F.3d 53 (D.C. Cir. 2006) (holding that only means to challenge the substantive validity of a biological opinion prepared by a consultant agency is on review of FERC's decision in the court of appeals).

2

Regardless of the foregoing, the Court lacks jurisdiction because petitioners lack Article III standing, as discussed in Part I of the Argument below.

## PERTINENT STATUTES

All pertinent statutes are set forth in the addendum following this response.

## STATEMENT OF THE CASE

### A.     Statutory background

Congress enacted the Air Tour Management Act in 2000.  Pub. L. No. 106-181, §§ 801-809, 114 Stat. 61, 185-94 (codified as amended at 49 U.S.C. § 40128 and note).  The Act requires operators wishing to conduct commercial air tours over certain National Park System units ("parks") or over tribal lands within or abutting parks to apply to FAA for authority to conduct such tours.  49 U.S.C. § 40128(a)(2)(A); *see also id*. § 40128(a)(3), (a)(5), (e), (f); Pub. L. No. 106-181, § 809, 114 Stat. at 194 (exceptions and exemptions).

As initially enacted in 2000, the Act provides that when an operator applies for authority to conduct tours over a park or tribal land, the FAA, "in cooperation with" NPS, "shall establish an air tour management plan" for that park or tribal land.  49 U.S.C. § 40128(b)(1)(A).  The objective is to "develop acceptable and effective measures to mitigate or prevent the significant adverse impacts, if any, of commercial air tour operations upon the natural and cultural resources, visitor experiences, and tribal lands."  *Id.* § 40128(b)(1)(B).  A plan "may prohibit"

3

commercial air tour operations over a national park in whole or in part, or "may establish" conditions for the conduct of commercial air tour operations over a national park. *Id.* § 40128(b)(3)(A)-(B). The need for implementation of any measures must be justified and documented in the plan and within a record of decision. *Id.* § 40128(b)(3)(F).

The Act sets forth a public process for the development of any plan. *Id.* § 40128(b)(4). This process includes meeting the procedural requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq. *See* 49 U.S.C. § 40128(b)(2). NEPA requires federal agencies to prepare environmental impact statements before engaging in "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Not all agency actions have such an effect. To determine whether significant environmental effects are expected, an agency may prepare an environmental assessment to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9.

Whatever level of environmental review is used to comply with NEPA, the Act requires approval of environmental decision documents by both FAA and NPS. 49 U.S.C. § 40128(b)(2). The adoption of a plan also requires approval by both agencies. *Id.* (agency heads "shall each sign" the record of decision for a

plan); *see also* S. Rep. No. 106-9, at 46 (1999) ("If either agency fails to sign or refuses to sign, the [plan] will be considered premature and not in force."); H.R. Rep. No. 106-167, at 95-96 (1999) (approval requirements are "intended to ensure that NPS and FAA agree" on a plan).[1]  An adopted plan is subject to judicial review.  49 U.S.C. § 40128(b)(5).

Because Congress understood that developing a plan that meets these requirements could take some time, the Act provides that prior to the establishment of a plan, FAA "shall grant interim operating authority" to existing air tour operators that apply for prospective operating authority.  49 U.S.C. § 40128(c)(1); *see also id*. § 40128(c)(2)(E) (interim operating authority terminates 180 days after establishment of a plan); H.R. Rep. No. 106-167, at 96.  Interim operating authority is limited to the number of commercial air tour operations reportedly flown by an applicant-operator prior to the statute's enactment.  49 U.S.C. § 40128(c)(2).

Members of Congress understood that the statute's cooperative framework "may be a difficult venture as both agencies have different priorities in this matter."  H.R. Rep. No. 106-167, at 93.  FAA's primary mission is to provide the safest, most efficient use of aerospace.  *See, e.g*., 49 U.S.C. §§ 40101-40104.

---

[1] After both agencies sign a record of decision for a plan, creation of additional documents, procedures, and operation specifications to implement the plan may be needed.  *See* Declaration of Keith A. Lusk, Exhibit B at 82-83 (attached hereto).

NPS's primary mission is to conserve and provide for the enjoyment of scenery, natural and historic objects, and wildlife in parks and to leave them unimpaired for the enjoyment of future generations.  *See, e.g.*, 54 U.S.C. § 100101(a).  As explained below, given the substantial divergence in the missions of the two agencies and their differing policies regarding environmental analyses, satisfying the Act's requirement that environmental decision documents and plans be approved by both agencies proved to be a difficult undertaking.

In recognition of these challenges, Congress amended the Act in 2012.  *See* FAA Modernization and Reform Act of 2012, Pub. L. No. 112-95, § 501, 126 Stat. 11, 100-03.  The amendments authorized FAA and NPS to enter into voluntary agreements with air tour operators in lieu of developing plans.  49 U.S.C. § 40128(b)(7)(A).  Voluntary agreements are contracts intended to "address the management issues necessary to protect the resources of such park and visitor use of such park without compromising aviation safety or the air traffic control system." *Id*. § 40128(b)(7)(B).  Voluntary agreements may include elements similar to plans.  *Id*.  After consultation with Indian tribes and an opportunity for public review, a voluntary agreement "may be implemented without further administrative or environmental process."  *Id*. § 40128(b)(7)(C).  Thus, in contrast to plans, voluntary agreements are not subject to analysis under NEPA.

The 2012 amendments exempt national parks with 50 or fewer tours annually from the provisions of the Act requiring plans or voluntary agreements. *Id.* § 40128(a)(5)(A).  NPS may withdraw an exemption if it determines that a plan or a voluntary agreement is necessary to protect park resources or visitor use and enjoyment.  *Id.* § 40128(a)(5)(B).

The amendments add reporting requirements for operators conducting commercial air tour operations over national parks.  *Id.* § 40128(d).  The amendments also allow for modifications of interim operating authority without further environmental review if certain conditions are satisfied:  (1) adequate information regarding existing and proposed operations is provided to the agencies; (2) the FAA determines there would be no adverse impact on aviation safety or the air traffic control system; and (3) NPS agrees with the modification based on professional expertise regarding the protection of park resources, values, and visitor use and enjoyment of the park.  *Id.* § 40128(c)(2)(I).

## B.    Factual background

### 1.    Initial steps to implement the Act

Following enactment of the 2000 Act, the agencies' initial focus was primarily on developing rules, regulations, and guidance; establishing the National Park Overflights Advisory Group; and developing an implementation plan.  *See*

Declaration of Keith A. Lusk ("Lusk Decl.") ¶¶ 6-23 (attached hereto); Declaration
of Karen Trevino ("Trevino Decl.") ¶¶ 8-13 (attached hereto).

### a.    Regulations

In 2002, FAA published a final rule (effective in January 2003) to fulfill a
statutory requirement to complete the definition of commercial air tour operation.
*See* 49 U.S.C. § 40128(g)(4)(A); 67 Fed. Reg. 65,662 (Oct. 25, 2002).  With the
completion of the definition, commercial air tour operators were required to apply
for operating authority.  *See id.* at 65,665. The regulations also included provisions
addressing interim operating authority.  *See id.* at 65,663, 65667, 65,669.  In 2007,
FAA renumbered these regulations and consolidated them with other rules
establishing safety and oversight rules for a broad variety of sightseeing and
commercial air tour flights. 72 Fed. Reg. 6912 (Feb. 13, 2007); 14 C.F.R.
Part 136 (2018).

### b.    Establishment of Advisory Group

As directed by the Act, FAA and NPS established the National Park
Overflights Advisory Group composed of representatives of the two agencies and
of aviation, tour operator, environmental, and tribal interests; the Advisory Group
provides continuing advice and recommendations with respect to the Act's
implementation, commonly accepted quiet aircraft technology, measures to
accommodate park visitor interests, and other issues.  *See* Pub. L. No. 106-181,

§ 805, 114 Stat. at 193-94; 49 U.S.C. § 40128 note; Lusk Decl. ¶¶ 17-20.  On a

continuing basis, FAA and NPS undertake numerous tasks in order to maintain the

Advisory Group.  *See id*.; Trevino Decl. ¶¶ 10-12.  Since its establishment shortly

after 2000, the Advisory Group has provided valuable advice on issues related to

implementation of the Act.

### c.      Memorandum of Understanding and Implementation Plan

In January 2004, FAA and NPS executed a Memorandum of Understanding

establishing a framework for cooperation and participation between the agencies to

implement the Act.  Lusk Decl. ¶ 21; *id.*, Exhibit A; Trevino Decl. ¶13.  Among

the topics addressed in the memorandum were procedures, organization, funding,

and conflict resolution.  The agencies worked together to produce two versions of a

comprehensive Implementation Plan—one in 2005 and another in 2007—that

provides detailed guidance to FAA, NPS, other associated agencies, and

contractors.  *See* Lusk Decl. ¶¶ 22-23; *id.*, Exhibits B-C.  However these

Implementation Plans were never formally approved by both agencies.  Lusk Decl.

¶¶ 22-23.

### d.      Issuance in 2005 of interim operating authority to existing operator applicants

In 2005, FAA published notice that it was granting interim operating

authority to existing operator applicants.  *See* 70 Fed. Reg. 36,456 (June 23, 2005);

*see also* 70 Fed. Reg. 3972 (Jan. 27, 2005) (providing opportunity for operators to correct applications); 70 Fed. Reg. 58,778 (Oct. 7, 2005) (supplemental notice); 72 Fed. Reg. 6802 (Feb. 13, 2007) (opinion concluding that interim operating authority is not transferable). The number of operations authorized by FAA was based on information submitted by the applicants about their pre-Act operations.

### 2. Noise studies and modeling

Between 2002 and 2011, FAA and NPS engaged the John A. Volpe National Transportation Systems Center to conduct studies to measure baseline ambient sound levels at numerous parks. *See* Lusk Decl. ¶ 27-29; Trevino Decl. ¶ 14. The Center also worked with the agencies on modeling and other noise-related research projects. *Id*. ¶ 28. Since 2011, NPS has continued work on acoustic inventories and monitoring at numerous parks. Trevino Decl. ¶¶ 14-20; *id.*, Exhibit A.

### 3. Efforts to develop air tour management plans for specific parks

From 2003 to 2011, the agencies worked diligently and took many steps toward developing plans at sixteen parks, including four of petitioners' preferred seven parks— Haleakala National Park, Hawaii Volcanoes National Park, Lake Mead National Recreation Area, and Muir Woods National Monument. Lusk Decl. ¶¶ 30-41; Trevino Decl. ¶¶ 21-22. But there emerged significant challenges to the development of these plans and their associated NEPA analyses, primarily resulting from differences between the respective core missions of FAA and NPS,

10

as well as the agencies' divergent positions on roles and responsibilities, policies

and procedures and their respective approaches to environmental analysis.  Lusk

Decl. ¶ 45; Trevino Decl. ¶¶ 21-24.  Examples of these issues include:

- NPS sought agreement that it would be responsible for determinations regarding the significance of impacts to park resources when conducting the environmental review required under NEPA for a plan.  FAA did not agree with abdicating its role in these environmental review determinations.

- The agencies disagreed on the appropriate metrics/methods and thresholds of significance to be used to measure and characterize air tour noise and its effects.

- The agencies disagreed as to the range of alternatives required and appropriate to consider in the NEPA process.

Lusk Decl. ¶ 45; Trevino Decl. ¶ 24.  FAA and NPS worked to resolve these and

other issues between 2004 and 2011, but they were unable to reach resolution on a

number of the issues.  Lusk Decl. ¶ 45.  The agencies consequently did not get

beyond initial stages of environmental review for the specific parks and never

issued a draft NEPA document for public review and comment.  *Id.*

### 4. After 2012, the agencies focused on implementing the amendments and the voluntary agreement process

After Congress amended the Act in 2012 to provide the agencies with more

flexibility, the agencies agreed to put development of plans on hold and to focus

their limited resources and efforts on implementation of the new reporting

requirements and on developing voluntary agreements.  Lusk Decl. ¶ 45; Trevino

Decl. ¶ 25.  As required by the Act, the agencies jointly developed a reporting

11

system and began implementing the new reporting requirements in January 2013. Lusk Decl. ¶¶ 47, 49; Trevino Decl. ¶¶ 26-335.

### a.    Exemptions

The reported data has been used to identify parks that meet criteria for exemption from the Act's plan or voluntary agreement provisions.  Lusk Decl. ¶¶ 48, 50, 58; Trevino Decl. ¶ 32.  An April 2018 Federal Register notice identified 53 parks as exempt based on 2016 reporting data.  83 Fed. Reg. 15,667, 15,668 (Apr. 11, 2018).  Based on more recent reporting data, 54 parks (out of 78 parks where interim operating authority has been granted) are exempt, including one of the parks at issue in this case, Muir Woods National Monument.  Lusk Decl. ¶ 48, 56; Trevino Decl. ¶ 49.

### b.    Voluntary agreements

Given their limited resources and the difficulties that they encountered in development of plans, the agencies agreed after the 2012 amendments to focus on development of voluntary agreements and committed to utilizing the voluntary agreement process wherever practicable.  Lusk Decl. ¶ 45-46; Trevino Decl. ¶ 25. FAA and NPS developed and agreed to a generic voluntary agreement template. Lusk Decl. ¶ 51.

Subsequently, voluntary agreements were completed for Big Cypress National Preserve and for Biscayne National Park in 2015 and 2016, respectively.

Lusk Decl. ¶¶ 53-54; Trevino Decl. ¶ 52.  In March 2018, the agencies finalized

agreements covering two parks with a high volume of air tours—Glen Canyon

National Recreation Area and Rainbow Bridge National Monument—with seven

commercial operators having interim operating authority for these parks.  Trevino

Decl. ¶¶ 36, 52; *id.*, Exhibit I; Lusk Decl. ¶ 55.  Two operators having interim

operating authority did not participate in the voluntary agreement process.  *Id*.

The agencies have done substantial work on voluntary agreements for

Badlands National Park and Mount Rushmore National Memorial.  Lusk Decl.

¶ 52.  A draft agreement with the existing fixed wing air tour operator is currently

under final review and is expected to be made available for public review in the

summer of 2019.  *Id*.  A separate agreement for existing helicopter operators at

Badlands National Park is also being prepared, and a draft is expected to go out for

public review later this year.  *Id*.

In addition to the parks mentioned above for which voluntary agreements

have been developed or are currently being developed, NPS and FAA officials

have conducted exploratory meetings with operators at several parks to assess

whether to pursue voluntary agreements.  Trevino Decl. ¶ 53; Lusk Decl. ¶ 57.

### c.    Reductions in interim operating authority

Given the new reporting information and time elapsed since the original list

was published, FAA in 2015-2016 reviewed the status of operators who had been

granted interim operating authority and eliminated such authority for operators that

no longer had active operating certificates.  As a result, interim operating authority

for multiple national parks was reduced or eliminated.  Lusk Decl. ¶ 60; Trevino

Decl. ¶ 49.  More generally, the agencies have been working to develop a process

to modify interim operating authority based on inactivity and underutilization, as

well as instances involving adverse impacts on park resources or visitor enjoyment.

Lusk Decl. ¶ 59; Trevino Decl. ¶ 46; *see also* 49 U.S.C. § 40128(c)(2)(I).  This

process is ongoing.

### 5. The agencies' current near-term priorities focus on pursuit of voluntary agreements or plans or both in tandem at specific parks

In March 2019, FAA and NPS met to discuss moving forward with

development of plans in addition to voluntary agreements.  Lusk Decl. ¶ 45;

Trevino Decl. ¶ 54.  The agencies revisited issues that had stymied earlier efforts to

complete plans and discussed ways in which those issues might be resolved given

changes in respective agency environmental policies and procedures.  *Id.*

In May 2019, high level NPS and FAA officials met to discuss the agencies'

Air Tour Management Act priorities and other issues related to the Act.

Declaration of Raymond M. Sauvajot ("Sauvajot Decl.") ¶ 5 (attached hereto);

Declaration of Kevin Welsh ("Welsh Decl.") ¶ 3 (attached hereto).  As a result of

these and other recent meetings, and in order to effectively implement the Act, the

14

agencies have agreed on an important shift in near-term priorities that focus on shared intention to pursue voluntary agreements and plans in tandem, and to prioritize resolving past differences so that the agencies have a path forward to successfully complete plans.  Sauvajot Decl. ¶¶ 6-7; Welsh Decl. ¶¶ 3-4.  The agencies agree that their preferred path would continue to be to complete voluntary agreements at non-exempt parks, but if they are unsuccessful in obtaining the participation of all operators or in executing voluntary agreements, they would promptly initiate plan processes.  Sauvajot Decl. ¶ 6; Welsh ¶¶ 3-5.  The agencies agreed to pursue the following park-specific actions:

- FAA and NPS will continue to work on finalizing voluntary agreements at Badlands National Parks and Mount Rushmore National Memorial.

- The agencies will initiate an air tour management planning process for Glen Canyon National Recreation Area and Rainbow Bridge National Monument.

- The agencies have agreed to initiate a voluntary agreement process at three parks, namely, Death Valley National Park, Mount Rainier National Park, and Great Smoky Mountains National Park (the last being one of petitioners' preferred parks).  For any particular park, if that process is not successful within a reasonable, established time period, NPS and FAA will initiate a plan process.

- No later than September 30, 2019, the agencies will finish preparation of a comprehensive schedule for completing these processes.  FAA and NPS will submit this schedule to the Court.

These parks were selected as near-term priorities based on work already done by the agencies and on their potential to serve as models for advancing additional agreements or plans or both over the longer term at remaining applicable

15

parks.  Sauvjot Decl. ¶ 7; Welsh ¶ 3-5.  The agencies have also agreed to work concurrently on addressing unused and overstated interim operating authority and enforcement issues.  Sauvajot Decl. ¶ 7(c)-(d); Welsh Decl. ¶ 4.

### SUMMARY OF ARGUMENT

1.    Petitioners do not satisfy the redressability prong of Article III standing because their requested relief—ordering completion of plans within 24 months at their preferred parks—is not available or appropriate relief in this circumstance.  Completion of air tour management plans is not a ministerial, clear-cut, or non-discretionary duty that can appropriately be compelled by mandamus because completion would require the agencies to agree on the content of environmental analyses and plans as to which each agency retains a degree of independent discretion.  Delays and obstacles to implementation of the Act stemming from the requirement for dual agency approval are for the political branches to resolve.  The Court is not equipped to resolve those issues, and it is not the Court's proper role.  The petition should accordingly be dismissed.

2.    In the alternative, mandamus is not warranted.  Contrary to petitioners' contention, Congress did not impose a mandatory deadline for completion of air tour management plans.  The most relevant *TRAC* factors weigh heavily against mandamus relief for unreasonable delay.  Even if the delays were unreasonable, this Court should exercise its equitable discretion to deny mandamus

16

given the agencies' recent agreement on a shift in strategy and the park-specific priorities for action to achieve progress in implementing the Act. The petition should be denied.

## ARGUMENT

### I. Mandamus is not available relief for petitioners' alleged injuries from delay in completion of plans or agreements.

A necessary predicate for the Court's exercise of jurisdiction is petitioners' demonstration of Article III standing. *See In re Idaho Conservation League*, 811 F.3d 502, 508 (D.C. Cir. 2016); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (party invoking jurisdiction has the burden of establishing standing). "The 'irreducible constitutional minimum' of Article III standing requires satisfaction of three elements: (1) a concrete and particularized and actual or imminent injury-in-fact that is (2) fairly traceable to the challenged action of the defendant . . . and (3) likely to be redressed by a favorable decision." *Id*. (quoting *Lujan*, 504 U.S. at 560).

Petitioners' alleged injury is diminished enjoyment of certain national parks due to noise and visual impacts of air tour operations. Petition 2.[2] They claim that these injuries would be redressed by completion of either a plan or a voluntary agreement with all air tour operators. But the contents of plans or agreements cannot be predetermined, and thus there is no guarantee that air tour impacts would be reduced with the implementation of plans or voluntary agreements. But even assuming that these declarations provide adequate evidence of injury for purposes of standing and that implementation of approved plans or agreements could eliminate or reduce such injuries, these assumptions are insufficient to demonstrate standing in the context of this case.

Redressability is satisfied only if a court can order effective relief. Petitioners' requested relief—ordering FAA and NPS to effect "completion" of plans at certain parks within 24 months unless a voluntary agreement is achieved

---

[2] In both the petition and several standing declarations, petitioners also rely on alleged injury to the economic value and enjoyment of their private property located many miles outside the parks. *E.g.*, Petition 2, 21-22; Miller Declaration (25 miles); Ernst Declaration (15 miles). But the Act is concerned with resources and visitor enjoyment of national parks and tribal lands *within* or abutting the parks and is aimed at operations in the air space above or within one-half mile of parks. *E.g.,* Pub. L. No. 106-181 § 802, 114 Stat. at 186; 49 U.S.C. §§ 40128(b)(1)(B), (b)(3). Declarants' interests in preventing overflights of distant private properties fall outside the Act's zone of interest. *See Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (holding that a cause of action under a statute extends only to plaintiffs whose interests fall within the zone of interests protected by the statute).

18

during that time period—is not a remedy available in mandamus and accordingly petitioners do not satisfy the redressability requirement for standing.[3]

A court's authority to issue mandamus relief is narrow. Traditionally, a court will issue a writ of mandamus "only where the duty to be performed is ministerial and the obligation to act peremptory, and clearly defined. The law must not only authorize the demanded action, but require it; the duty must be clear and undisputable." *13th Regional Corp. v. U.S. Dept. of Interior*, 654 F.2d 758, 763 (D.C. Cir. 1980); *accord Norton v. Southern Utah Wilderness Alliance* ("*SUWA*"), 42 U.S. 55, 64, 66 (2004) (mandamus is traditionally limited to requiring actions that are "ministerial or non-discretionary"); *Consolidated Edison Co. of New York, Inc. v. Ashcroft*, 286 F.3d 600, 605 (D.C. Cir. 2002) (same). Mandamus may not be used to impinge upon an agency's legitimate use of discretion. *Wilbur v. United States*, 281 U.S. 206, 218-19 (1930) (mandamus may not be used to force the exercise of discretion in a particular way); *cf. SUWA*, 542 U.S. 55, 65 (2004) (A

---

[3] In November 2018, this Court dismissed for lack of standing a petition filed by the same petitioners seeking mandamus relief only against FAA. *See In re Public Employees for Environmental Responsibility*, D.C. Cir. No. 18-1044 (filed Feb. 14, 2018). The Court held that the redressability element for standing was not satisfied because neither plans nor voluntary agreements can be issued without the approval of both FAA and NPS, and NPS was not a party. *Id.* (Nov. 13, 2018 Order). The present petition requests relief against NPS, but merely adding NPS as a party does not eliminate the redressability-related flaws described in the text.

"court can compel the agency to act [under Section 706(1) of the Administrative Procedure Act], but has no power to specify what the action must be.").

Under the Act, completion of a plan requires each agency to approve the environmental decision document and the record of decision for the plan. 49 U.S.C. § 40128(b)(2). Petitioners' request for a writ compelling the agencies to "complete" plans at certain parks within 24 months thus amounts to a request to order the agencies to agree on the content of environmental analyses and plans. But mandamus cannot properly be used to compel such agreement because under the statutory scheme, each agency retains some degree of independent discretion regarding the environmental analyses and action the agency will approve. *Cf. Consolidated Edison*, 286 F.3d at 605 (where a duty depends on a statute the construction or application of which is not free from doubt, it is regarded as involving the character of judgment or discretion which cannot be controlled by mandamus). Although the Air Tour Management Act generally requires establishment of plans or voluntary agreements for non-exempt parks, completion of a management plan is not a ministerial, clear-cut, or non-discretionary duty that can appropriately be compelled by mandamus.[4]

---

[4] Petitioners plainly lack standing to compel the agencies to complete voluntary agreements, because agreements require the cooperation and agreement of third-party operators, and petitioners have not adduced facts showing that operators will make choices in the agreements that will redress petitioners' alleged injuries. *See U.S. Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24-25 (D.C. Cir. 2000).

Separation-of-powers principles and institutional competencies reinforce that the general statutory requirement for plans or agreements is not judicially enforceable in these circumstances.  Delays and obstacles to implementation of the Act stemming from the requirement for joint agency approval are for the political branches to resolve.  *See, e.g., FCC v. Pottsville Broadcasting Co.*, 309 U.S. 134, 146 (1940) ("Congress which creates and sustains these agencies must be trusted to correct whatever defects experience may reveal."); *Missouri, Kansas & Texas Railway Co. v. May*, 194 U.S. 267, 270 (1904) ("legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts"); *cf. Organization for Competitive Markets v. USDA*, 912 F.3d 455, 463 (8th Cir. 2018) (denying mandamus where agency had made efforts to comply with statutory deadline to promulgate regulations, noting that "Congress can determine that its directive has been unreasonably delayed, and take appropriate action").  Congress can exercise oversight or enact legislation if it is dissatisfied with the pace of the agencies' implementation.

Unresolved disagreements between FAA and NPS that have slowed the development and approval of plans are issues that the Court is not equipped to resolve.  *See Grand Canyon Air Tour Coalition v. FAA*, 154 F.3d 455, 476 (D.C. Cir. 1998) ("Although the APA gives courts the authority to 'compel agency action unlawfully withheld or unreasonably delayed,' we are acutely aware of the limits

of our institutional competence in the highly technical area at issue in this case."

(citations omitted)).  Not only are such issues highly technical, this is not the

Court's appropriate role in a system of separated powers.[5]

In sum, the requested relief—a writ ordering completion of plans or

agreements at certain parks within 24 months—is simply not available to

petitioners.  Consequently, their alleged harms are not redressable, and they

lack Article III standing.  The petition should be dismissed on that basis.

## II.     Mandamus relief is not warranted.

Mandamus is a drastic remedy to be invoked only in extraordinary

circumstances.  *See Citizens for Responsibility & Ethics in Washington v. Trump*,

No. 18-5150, 2019 WL 2261089, at *3 (D.C. Cir. 2019); *American Hospital Ass'n*

*v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016); *In re Bluewater Network*, 234 F.3d

1305, 1315 (D.C. Cir. 2000).  This has two implications.

First, in order to obtain mandamus relief based on a claim of unreasonable

delay, a petitioner has the burden to demonstrate that (1) its right to issuance of the

writ is clear and indisputable, (2) the government official is violating a clear duty

to take discrete action and a finding of unreasonable delay in taking that action,

---

[5] Another way of looking at these considerations is that petitioners cannot satisfy
threshold jurisdictional requirements for their requested mandamus relief, as set
out in Part II immediately below.  For example, petitioners' right to issuance of the
requested writ is *not* clear and indisputable for the reasons discussed in this Part I.

and (3) no adequate alternative remedy exists. *See Citizens for Responsibility & Ethics*, 2019 WL 2261089, at *3; *American Hospital*, 812 F.3d at 189. Unless all of these threshold jurisdictional requirements are met, the petition must be dismissed. *See id.*; *Sierra Club v. Thomas*, 828 F. 2d 783, 799 (D.C. Cir. 1987).

Second, even when the threshold legal requirements for mandamus have been satisfied, "a court may grant relief only when it finds compelling equitable grounds." *American Hospital*, 812 F.3d at 189 (internal quotation marks omitted). The issuance of a writ is a matter of the Court's equitable discretion, and mandamus may be denied even when the threshold requirements for mandamus relief are satisfied and unreasonable delay is found. *In re Barr Laboratories, Inc.*, 930 F.2d 72, 74 (D.C. Cir. 1991). Each case must be analyzed according to its own circumstances. *American Hospital*, 812 F.3d at 189.

## A.     The Act does not impose the duties that petitioners allege.

### 1.     The Act imposes no mandatory deadline for completion of plans or agreements.

Central to the petition is the repeated assertion that the Act contains a mandatory deadline directing the agencies to complete management plans or voluntary agreements within 24 months of receipt of an application for operating authority. *See, e.g.*, Petition 1, 5-6, 13. This is not, however, a case where the statute creates a clear duty by imposing a date-certain mandatory deadline for discrete agency action. *Compare, e.g., American Hospital*, 812 F.3d at (finding

23

clear duty to comply with statutory time deadlines).  The Act simply does not impose a 24-month deadline (or any other deadline) for completion of management plans or agreements.

Petitioners' assertion that the Act imposed a 24-month deadline is based primarily on 49 U.S.C. § 40128(a)(2)(D)-(E).  Subparagraph (a)(2)(D) provides that "[b]efore granting an application under this paragraph, [FAA], in cooperation with [NPS], shall develop and implement an air tour management plan."  Subparagraph (a)(2)(E) provides that FAA "shall make every effort to act on any [air tour operator] application under this paragraph and issue a decision on the application not later than 24 months after it is received or amended."  But "every effort" is not tantamount to a mandatory deadline.  Rather, this term signifies an aspirational goal for FAA to act on applications and expressly negates any notion that the Act imposed an inflexible 24-month deadline for issuance of plans.  As demonstrated above and in the supporting declarations, both agencies have devoted countless hours and made serious efforts to implement the Act.

Other provisions of the Act expressly recognize that management plans might not be completed within 24 months after receipt of an application. *See* 49 U.S.C. § 40128(c)(3)(C) (among the conditions for granting interim operating authority to new entrant operators is that no management plan for the relevant park has been completed within 24 months after the statute's enactment).  The statutory

24

scheme further supports the conclusion that there is no statutory deadline for completion of a plan or voluntary agreement because neither of these actions is a matter that FAA alone or NPS alone can control.

The legislative history for the 2000 Act bolsters this conclusion. The House Report recognized that the process for establishing management plans "may be drawn out, especially over parks where air tours are highly controversial." H.R. Rep. No. 106-167, at 96. When Congress amended the Act in 2012 to create the voluntary agreement process as an alternative to plan development, it was presumably aware that no plans had been completed; nevertheless, Congress (again) set no deadline for completion of an agreement or plan.

In short, the Act imposes no mandatory time deadline for completing plans or agreements.

### 2. One of the parks as to which petitioners seek mandamus relief is exempt from requirements relating to plans or agreements.

One of the parks as to which petitioners seek an order directing the agencies to complete a plan or agreement—Muir Woods National Monument—is currently exempt under the Act. *See* Lusk Decl. ¶ 56; Trevino Decl. ¶ 25. As to that park, therefore, the agencies have no duty that could satisfy threshold requirements for mandamus relief.

*   *   *   *   *

In sum, petitioners' contentions that the Act imposes mandatory time deadlines to complete plans or voluntary agreements and that all of their preferred parks are subject to such requirement is incorrect.

### B.     Mandamus relief is not warranted under the *TRAC* factors.

A writ is unwarranted for other reasons as well.  A court's authority to issue mandamus relief based on unreasonable delay is narrow and requires the court to find that the agency's delay of a clear duty to take discrete action is "so egregious as to warrant mandamus."  *American Hospital*, 812 F.3d at 189 (internal quotation marks omitted).  A "'finding that delay is unreasonable does not, alone, justify judicial intervention.'"  *Cobell v. Norton*, 240 F.3d 1081, 1096 (D.C. Cir. 2001). (quoting *Barr Laboratories*, 930 F.2d at 75).

Drawing on cases that have interpreted the Administrative Procedure Act provision that authorizes courts to compel "agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), *TRAC* identified various factors to be considered in determining whether an agency's delay warrants mandamus.  These factors include

> (1) the time agencies take to make decisions must be governed by a rule of reason;
>
> (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;

(3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

(4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

(5) the court should also take into account the nature and extent of the interests prejudiced by delay;

(6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*TRAC*, 750 F.2d at 80 (internal quotation marks and citations omitted).

In *American Hospital*, the Court explained that the *TRAC* factor analysis may be relevant both to the jurisdictional question of whether mandamus *could* issue and to the equitable question of whether mandamus *should* issue. 812 F.3d at 189-90. This Court has emphasized that these factors are not "ironclad," and that "[e]ach case must be analyzed according to its own unique circumstances." *Id.* at 189 (quoting *Air Line Pilots*, 750 F.2d at 81). Consequently, "[r]esolution of a claim of unreasonable delay is ordinarily a complicated and nuanced task requiring consideration of the particular facts and circumstances before the court." *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003). "There is no per se rule as to how long is too long to wait for agency action." *In re Core Communications, Inc.*, 531 F.3d 849, 855 (D.C. Cir.2008) (quoting *In re American Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004)).

In this case, the second and fourth factors are most relevant and give context to the first factor.  These factors militate heavily against judicial intervention.

### 1.    The context and statutory scheme weigh heavily against granting the requested order.

A court must give due consideration to the statutory context and practical difficulty in carrying out a legislative mandate.  *See In re International Chemical Workers Union*, 958 F.2d 1144, 1149 (D.C. Cir. 1992); *Cobell*, 240 F.3d at 1097. Though no management plans have been completed, FAA and NPS have not been idle.  Far from it:  they have devoted considerable effort and resources to development of plans and voluntary agreements (and also to carrying out their other responsibilities under the Act).  *See supra* pp. 7-14.  But the agencies have also encountered significant obstacles to development and completion of plans stemming from the different missions of the agencies and the requirement that both agencies approve environmental documents and decisions.  *See supra* pp. 10-11. They continue to work on finding solutions to problems encountered.  *See supra* pp. 14-16; *infra* pp. 33-34.

The agencies' efforts, combined with the statutory context, weigh heavily against the imposition of deadlines as sought in this petition.  As discussed above, FAA lacks legal authority to complete a plan or agreement by itself without NPS agreement and vice versa.  *See supra* pp. 4-5, 20-21.  Each agency has some degree of discretion as to the content of environmental decision documents and plan.  As

also explained above, the statute does not impose a deadline on the agencies to develop air tour management plans.  To the extent that Section 40128(a)(2)(E) indicates a goal of expediency in development of plans, the agencies' implementation actions and efforts made apparent that two years was not a realistic goal.

Another contextual factor counseling against imposing deadlines is that development of a plan involves complex technical issues, requiring study and modeling, identification of possible alternatives, and extensive environmental analysis. *See, e.g.,* Lusk Decl. ¶ 26; *id.*, Exhibit C, at 2-9 to 2-18, 3-6 to 3-11, Appendices E-2 an E-3..  Under far less challenging conditions than here, environmental review alone of federal agencies' proposed actions may take years. *See* Lusk Decl. ¶ 26.[6]

### 2. Due consideration of agency priorities provides further reason to deny the requested mandamus relief.

Under the fourth TRAC factor, consideration must also be given to an agency's need to prioritize in the face of limited resources:  "Respect for the autonomy and comparative institutional advantage of the executive branch has

---

[6] A CEQ *Report on Environmental Impact Statement Timelines (2010-2017)*, https://www.whitehouse.gov/wp-content/uploads/2017/11/ CEQ-EIS-Timelines-Report.pdf, found that across all federal agencies, the average EIS completion time was 4.5 years, and the median time was 3.6 years.  The time for completion is influenced by the technical complexity, as well as other factors, e.g., community concerns or funding.

traditionally made courts slow to assume command over an agency's choice of priorities." *Barr Laboratories*, 930 F.2d at 74.  As explained above (pp. 7-16) and in the Lusk and Trevino Declarations, the agencies have at various points set priorities for carrying out their responsibilities under the Act.

The agencies recently agreed to shift and broaden their near-term priorities to include using voluntary agreement and/or management processes in tandem at several parks, including one of petitioners' preferred parks (Great Smoky Mountains National Park).  These parks were selected for priority to achieve successful plans or agreements that could then serve as a model for other parks. This Court should not upset those priorities by ordering that precedence be given to petitioners' preferences as to other parks, particularly given the absence of good reason to do so.  *Sierra Club*, 828 F.2d at 797; *Barr Laboratories, Inc*., 930 F.2d at 75 (a judicial order putting petitioner at the head of the queue simply moves all others back one space).

In addition, it is not practicable for the agencies concurrently to develop and complete plans or voluntary agreements at all of petitioners' preferred parks within two years.  *See* Welsh Decl. ¶ 5.  Developing plans or voluntary agreements is technically complex given complicated air spaces, the unresolved issues between the agencies that have hampered completion of environmental review processes, the joint approval requirements for completion of management plans, the limited

30

resources, and the agencies' other responsibilities. *See* Lusk Decl. ¶¶ 26-45;

Trevino Decl. ¶¶ 14-25; *id.*, Exhibit I.

Crucially, air tour planning is a small component of FAA's overall mission

to provide the safest, most efficient aerospace system in the world. The air tour

management program must compete for resources with other agency priorities and

responsibilities. Lusk Decl. ¶¶ 43. The National Park System currently includes

419 individual units covering more than 85 million acres in all 50 states, the

District of Columbia, and U.S. territories. While reducing the impacts of air tours

remains a high priority for NPS at those parks where air tours occur, the NPS's

mission to preserve resources and ensure high quality visitor experiences requires

it to give priority as well to addressing other issues that may affect the natural and

cultural resources in the NPS's care.

### 3.     The third and fifth *TRAC* factors carry little weight in this case.

Petitioners argue that the third *TRAC* factor weighs in favor of mandamus

relief because human health and welfare are at stake as result of harm to visitors'

enjoyment of national parks from air tour noise and visibility. Petition 17. They

similarly rely on the fifth *TRAC* factor, claiming that their interests are the interests

intended to be protected by the Act. *Id.* at 19. However, these factors should carry

little weight here. Diminished enjoyment of a park is not, as petitioners' citation

suggests, equivalent to a substantial human health risk associated with delayed

regulation of a toxic chemical.  *See id.* at 17 (citing *Public Citizen Health Research Group v. Auchter*, 702 F.2d 1150, 1157 (D.C. Cir. 1983)).  The legislative history indicates that Congress intended to strike a balance among park visitors' differing interests.  *See* H.R. Rep. No. 106-167, at 93.  Finally, neither of these *TRAC* factors stands for the proposition that petitioners' preferred parks should be given priority over other parks in development of plans or voluntary agreements.

### C.     The Court should exercise its equitable discretion to deny mandamus relief.

Even if the Court concludes that delay has been unreasonable and that mandamus relief could issue, it must also determine that compelling equitable grounds now exist to issue a writ to the agencies.  The court has broad discretion in weighing the equities to decide whether mandamus should issue.  The factors discussed above provide sound reasons for this Court to exercise its equitable discretion to deny the petition.

In addition, petitioners are the first parties to have challenged delay in implementation of the Act.  *Cf. Grand Canyon Air Tour Coalition*, 154 F.3d at 477 (noting that the suit was the first time any party had challenged the agency's delay and therefore "this is not a case where an agency has been contumacious in ignoring court directions to expedite decision-making"); *13th Regional Corp.*, 654 F.2d at 763 (opining that as with any remedy governed by equitable principles,

mandamus must be sought with reasonable promptness; and denying mandamus due to plaintiffs' delay of seven years to seek relief).

Further, the agencies themselves remain committed to implementing the Act; they have not disavowed responsibility to develop plans or agreements. *Cf. Bluewater Network*, 234 F.3d at 1315-16 (major factor supporting mandamus was the agency's positon that it would do nothing further). Indeed, the agencies have devoted considerable resources and effort on implementing the Act over the years and are making renewed efforts to resolve issues related to developing plans while prioritizing voluntary agreement and plan processes at several parks. *See supra* pp. 14-16. These priorities and other actions (e.g., addressing unused or overstated interim authority) are based on a hard look at the factors that have impeded progress in the past and together constitute a coherent strategy for increasing incentives for operators with interim operating authority to participate in voluntary agreements and for completing plans where those agreements are unsuccessful. The agencies believe that their shift in approach can attain results at the targeted parks and that success at those parks could then serve as a model for successful completion of plans or agreements at the remaining non-exempt parks.

This Court should stay its hand while the agencies pursue this strategy and park-specific priorities. *See, e.g., In re Center for Auto Safety*, 793 F.2d 1346, 1354 (D.C. Cir. 1986) (finding that the agency's delay unreasonable but declining

33

to order mandamus because the agency had made some progress); *TRAC*, 750 F.2d at 80 (declining to test delay against *TRAC* factors because of assurances from agency that it is moving expeditiously); *cf. In re Aiken County*, 725 F.3d 255, 258-59 (D.C. Cir. 2013) (granting mandamus only after deferring judicial interference for several years).

In sum, the *TRAC* factors and other equitable considerations provide sound reasons to deny the petition.

## CONCLUSION

For the foregoing reasons, the petition for a writ of mandamus should be dismissed or denied.

Respectfully submitted,

/s/ Ellen J. Durkee
JEFFREY BOSSERT CLARK
*Assistant Attorney General*
ERIC GRANT
*Deputy Assistant Attorney General*
ANDY MERGEN
ELLEN J. DURKEE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-4426
ellen.durkee@usdoj.gov

Of Counsel:

MICHAEL FINEMAN
CATHERINE BASIC
*Attorneys*
Office of the Chief Counsel
Federal Aviation Administration

SARA PORSIA
Office of the Solicitor
U.S. Department of the Interior

July 1, 2019
90-13-1-15766

34

## CERTIFICATE OF COMPLIANCE

This response contains 7793 words, excluding the cover, Certificates, tables, glossary, and signature block, according to the count of Microsoft Word 2016. The response's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

/s/ Ellen J. Durkee
ELLEN J. DURKEE

Counsel for Respondents

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2019, I electronically filed the foregoing

response with the Clerk of the Court for the United States Court of Appeals for the

District of Columbia Circuit using the Appellate Electronic Filing system.

The participants in the case are registered CM/EF users and service will be

accomplished by the appellate CM/ECF system

/s/ Ellen J. Durkee
ELLEN J. DURKEE

Counsel for Respondents

**STATUTORY AND REGULATORY ADDENDUM**

# TABLE OF CONTENTS

28 U.S.C. 40128 ................................................................................. A-1

National Parks Air Tour Management Act in 2000, Pub. L. No. 106-181
  Sections 801-809, 114 Stat. 61, 186 ................................................ A-7

(c) AIRCRAFT OWNED OR OPERATED BY THE ARMED FORCES.—

(1) IN GENERAL.—Subject to paragraph (2), an aircraft described in section 40102(a)(41)(E) qualifies as a public aircraft if—

(A) the aircraft is operated in accordance with title 10;

(B) the aircraft is operated in the performance of a governmental function under title 14, 31, 32, or 50 and the aircraft is not used for commercial purposes; or

(C) the aircraft is chartered to provide transportation or other commercial air service to the armed forces and the Secretary of Defense (or the Secretary of the department in which the Coast Guard is operating) designates the operation of the aircraft as being required in the national interest.

(2) LIMITATION.—An aircraft that meets the criteria set forth in paragraph (1) and that is owned or operated by the National Guard of a State, the District of Columbia, or any territory or possession of the United States, qualifies as a public aircraft only to the extent that it is operated under the direct control of the Department of Defense.

(d) SEARCH AND RESCUE PURPOSES.—An aircraft described in section 40102(a)(41)(D) that is not exclusively leased for at least 90 continuous days by the government of a State, the District of Columbia, or a territory or possession of the United States or a political subdivision of 1 of those governments, qualifies as a public aircraft if the Administrator determines that—

(1) there are extraordinary circumstances;

(2) the aircraft will be used for the performance of search and rescue missions;

(3) a community would not otherwise have access to search and rescue services; and

(4) a government entity demonstrates that granting the waiver is necessary to prevent an undue economic burden on that government.

(Added Pub. L. 106–181, title VII, §702(b)(1), Apr. 5, 2000, 114 Stat. 155; amended Pub. L. 110–181, div. A, title X, §1078(b), (c), Jan. 28, 2008, 122 Stat. 334; Pub. L. 112–141, div. C, title V, §35003, July 6, 2012, 126 Stat. 843.)

AMENDMENTS

2012—Subsec. (d). Pub. L. 112–141 added subsec. (d).
2008—Subsec. (b). Pub. L. 110–181, §1078(c)(1), substituted "section 40102(a)(41)" for "section 40102(a)(37)".
Subsec. (c)(1). Pub. L. 110–181, §1078(c)(2), substituted "section 40102(a)(41)(E)" for "section 40102(a)(37)(E)" in introductory provisions.
Subsec. (c)(1)(C). Pub. L. 110–181, §1078(b), inserted "or other commercial air service" after "transportation".

EFFECTIVE DATE OF 2012 AMENDMENT

Amendment by Pub. L. 112–141 effective Oct. 1, 2012, see section 3(a) of Pub. L. 112–141, set out as an Effective and Termination Dates of 2012 Amendment note under section 101 of Title 23, Highways.

EFFECTIVE DATE

Section applicable only to fiscal years beginning after Sept. 30, 1999, see section 3 of Pub. L. 106–181, set out as an Effective Date of 2000 Amendments note under section 106 of this title.

TRANSFER OF FUNCTIONS

For transfer of authorities, functions, personnel, and assets of the Coast Guard, including the authorities and functions of the Secretary of Transportation relating thereto, to the Department of Homeland Security, and for treatment of related references, see sections 468(b), 551(d), 552(d), and 557 of Title 6, Domestic Security, and the Department of Homeland Security Reorganization Plan of November 25, 2002, as modified, set out as a note under section 542 of Title 6.

§ 40126. Severable services contracts for periods crossing fiscal years

(a) IN GENERAL.—The Administrator of the Federal Aviation Administration may enter into a contract for procurement of severable services for a period that begins in 1 fiscal year and ends in the next fiscal year if (without regard to any option to extend the period of the contract) the contract period does not exceed 1 year.

(b) OBLIGATION OF FUNDS.—Funds made available for a fiscal year may be obligated for the total amount of a contract entered into under the authority of subsection (a).

(Added Pub. L. 106–181, title VII, §705(a), Apr. 5, 2000, 114 Stat. 157.)

EFFECTIVE DATE

Section applicable only to fiscal years beginning after Sept. 30, 1999, see section 3 of Pub. L. 106–181, set out as an Effective Date of 2000 Amendments note under section 106 of this title.

§ 40127. Prohibitions on discrimination

(a) PERSONS IN AIR TRANSPORTATION.—An air carrier or foreign air carrier may not subject a person in air transportation to discrimination on the basis of race, color, national origin, religion, sex, or ancestry.

(b) USE OF PRIVATE AIRPORTS.—Notwithstanding any other provision of law, no State or local government may prohibit the use or full enjoyment of a private airport within its jurisdiction by any person on the basis of that person's race, color, national origin, religion, sex, or ancestry.

(Added Pub. L. 106–181, title VII, §706(a), Apr. 5, 2000, 114 Stat. 157.)

EFFECTIVE DATE

Section applicable only to fiscal years beginning after Sept. 30, 1999, see section 3 of Pub. L. 106–181, set out as an Effective Date of 2000 Amendments note under section 106 of this title.

§ 40128. Overflights of national parks

(a) IN GENERAL.—

(1) GENERAL REQUIREMENTS.—A commercial air tour operator may not conduct commercial air tour operations over a national park or tribal lands, as defined by this section, except—

(A) in accordance with this section;

(B) in accordance with conditions and limitations prescribed for that operator by the Administrator; and

(C) in accordance with any applicable air tour management plan or voluntary agreement under subsection (b)(7) for the park or tribal lands.

(2) APPLICATION FOR OPERATING AUTHORITY.—

(A) APPLICATION REQUIRED.—Before commencing commercial air tour operations over a national park or tribal lands, a com-

mercial air tour operator shall apply to the Administrator for authority to conduct the operations over the park or tribal lands.

(B) COMPETITIVE BIDDING FOR LIMITED CAPACITY PARKS.—Whenever an air tour management plan limits the number of commercial air tour operations over a national park during a specified time frame, the Administrator, in cooperation with the Director, shall issue operation specifications to commercial air tour operators that conduct such operations. The operation specifications shall include such terms and conditions as the Administrator and the Director find necessary for management of commercial air tour operations over the park. The Administrator, in cooperation with the Director, shall develop an open competitive process for evaluating proposals from persons interested in providing commercial air tour operations over the park. In making a selection from among various proposals submitted, the Administrator, in cooperation with the Director, shall consider relevant factors, including—

(i) the safety record of the person submitting the proposal or pilots employed by the person;

(ii) any quiet aircraft technology proposed to be used by the person submitting the proposal;

(iii) the experience of the person submitting the proposal with commercial air tour operations over other national parks or scenic areas;

(iv) the financial capability of the person submitting the proposal;

(v) any training programs for pilots provided by the person submitting the proposal; and

(vi) responsiveness of the person submitting the proposal to any relevant criteria developed by the National Park Service for the affected park.

(C) NUMBER OF OPERATIONS AUTHORIZED.— In determining the number of authorizations to issue to provide commercial air tour operations over a national park, the Administrator, in cooperation with the Director, shall take into consideration the provisions of the air tour management plan, the number of existing commercial air tour operators and current level of service and equipment provided by any such operators, and the financial viability of each commercial air tour operation.

(D) COOPERATION WITH NPS.—Before granting an application under this paragraph, the Administrator, in cooperation with the Director, shall develop an air tour management plan in accordance with subsection (b) and implement such plan.

(E) TIME LIMIT ON RESPONSE TO ATMP APPLICATIONS.—The Administrator shall make every effort to act on any application under this paragraph and issue a decision on the application not later than 24 months after it is received or amended.

(F) PRIORITY.—In acting on applications under this paragraph to provide commercial air tour operations over a national park, the Administrator shall give priority to an application under this paragraph in any case in which a new entrant commercial air tour operator is seeking operating authority with respect to that national park.

(3) EXCEPTION.—Notwithstanding paragraph (1), commercial air tour operators may conduct commercial air tour operations over a national park under part 91 of the[1] title 14, Code of Federal Regulations if—

(A) such activity is permitted under part 119 of such title;

(B) the operator secures a letter of agreement from the Administrator and the national park superintendent for that national park describing the conditions under which the operations will be conducted; and

(C) the total number of operations under this exception is limited to not more than five flights in any 30-day period over a particular park.

(4) SPECIAL RULE FOR SAFETY REQUIREMENTS.—Notwithstanding subsection (c), an existing commercial air tour operator shall apply, not later than 90 days after the date of the enactment of this section, for operating authority under part 119, 121, or 135 of title 14, Code of Federal Regulations. A new entrant commercial air tour operator shall apply for such authority before conducting commercial air tour operations over a national park or tribal lands. The Administrator shall make every effort to act on any such application for a new entrant and issue a decision on the application not later than 24 months after it is received or amended.

(5) EXEMPTION FOR NATIONAL PARKS WITH 50 OR FEWER FLIGHTS EACH YEAR.—

(A) IN GENERAL.—Notwithstanding paragraph (1), a national park that has 50 or fewer commercial air tour operations over the park each year shall be exempt from the requirements of this section, except as provided in subparagraph (B).

(B) WITHDRAWAL OF EXEMPTION.—If the Director determines that an air tour management plan or voluntary agreement is necessary to protect park resources and values or park visitor use and enjoyment, the Director shall withdraw the exemption of a park under subparagraph (A).

(C) LIST OF PARKS.—

(i) IN GENERAL.—The Director and Administrator shall jointly publish a list each year of national parks that are covered by the exemption provided under this paragraph.

(ii) NOTIFICATION OF WITHDRAWAL OF EXEMPTION.—The Director shall inform the Administrator, in writing, of each determination to withdraw an exemption under subparagraph (B).

(D) ANNUAL REPORT.—A commercial air tour operator conducting commercial air tour operations over a national park that is exempt from the requirements of this section shall submit to the Administrator and the Director a report each year that includes

---

[1] So in original. The word "the" probably should not appear.

the number of commercial air tour operations the operator conducted during the preceding 1-year period over such park.

(b) AIR TOUR MANAGEMENT PLANS.—

(1) ESTABLISHMENT.—

(A) IN GENERAL.—The Administrator, in cooperation with the Director, shall establish an air tour management plan for any national park or tribal land for which such a plan is not in effect whenever a person applies for authority to conduct a commercial air tour operation over the park. The air tour management plan shall be developed by means of a public process in accordance with paragraph (4).

(B) OBJECTIVE.—The objective of any air tour management plan shall be to develop acceptable and effective measures to mitigate or prevent the significant adverse impacts, if any, of commercial air tour operations upon the natural and cultural resources, visitor experiences, and tribal lands.

(C) EXCEPTION.—An application to begin or expand commercial air tour operations at Crater Lake National Park or Great Smoky Mountains National Park may be denied without the establishment of an air tour management plan by the Director of the National Park Service if the Director determines that such operations would adversely affect park resources or visitor experiences.

(2) ENVIRONMENTAL DETERMINATION.—In establishing an air tour management plan under this subsection, the Administrator and the Director shall each sign the environmental decision document required by section 102 of the National Environmental Policy Act of 1969 (42 U.S.C. 4332) which may include a finding of no significant impact, an environmental assessment, or an environmental impact statement and the record of decision for the air tour management plan.

(3) CONTENTS.—An air tour management plan for a national park—

(A) may prohibit commercial air tour operations over a national park in whole or in part;

(B) may establish conditions for the conduct of commercial air tour operations over a national park, including commercial air tour routes, maximum or minimum altitudes, time-of-day restrictions, restrictions for particular events, maximum number of flights per unit of time, intrusions on privacy on tribal lands, and mitigation of noise, visual, or other impacts;

(C) shall apply to all commercial air tour operations over a national park that are also within ½ mile outside the boundary of a national park;

(D) shall include incentives (such as preferred commercial air tour routes and altitudes, relief from caps and curfews) for the adoption of quiet aircraft technology by commercial air tour operators conducting commercial air tour operations over a national park;

(E) shall provide for the initial allocation of opportunities to conduct commercial air

tour operations over a national park if the plan includes a limitation on the number of commercial air tour operations for any time period; and

(F) shall justify and document the need for measures taken pursuant to subparagraphs (A) through (E) and include such justifications in the record of decision.

(4) PROCEDURE.—In establishing an air tour management plan for a national park or tribal lands, the Administrator and the Director shall—

(A) hold at least one public meeting with interested parties to develop the air tour management plan;

(B) publish the proposed plan in the Federal Register for notice and comment and make copies of the proposed plan available to the public;

(C) comply with the regulations set forth in sections 1501.3 and 1501.5 through 1501.8 of title 40, Code of Federal Regulations (for purposes of complying with the regulations, the Federal Aviation Administration shall be the lead agency and the National Park Service is a cooperating agency); and

(D) solicit the participation of any Indian tribe whose tribal lands are, or may be, overflown by aircraft involved in a commercial air tour operation over the park or tribal lands to which the plan applies, as a cooperating agency under the regulations referred to in subparagraph (C).

(5) JUDICIAL REVIEW.—An air tour management plan developed under this subsection shall be subject to judicial review.

(6) AMENDMENTS.—The Administrator, in cooperation with the Director, may make amendments to an air tour management plan. Any such amendments shall be published in the Federal Register for notice and comment. A request for amendment of an air tour management plan shall be made in such form and manner as the Administrator may prescribe.

(7) VOLUNTARY AGREEMENTS.—

(A) IN GENERAL.—As an alternative to an air tour management plan, the Director and the Administrator may enter into a voluntary agreement with a commercial air tour operator (including a new entrant commercial air tour operator and an operator that has applied to conduct commercial air tour operations over a national park to manage commercial air tour operations over such national park.

(B) PARK PROTECTION.—A voluntary agreement under this paragraph with respect to commercial air tour operations over a national park shall address the management issues necessary to protect the resources of such park and visitor use of such park without compromising aviation safety or the air traffic control system and may—

(i) include provisions such as those described in subparagraphs (B) through (E) of paragraph (3);

(ii) include provisions to ensure the stability of, and compliance with, the voluntary agreement; and

(iii) provide for fees for such operations.

(C) PUBLIC REVIEW.—The Director and the Administrator shall provide an opportunity for public review of a proposed voluntary agreement under this paragraph and shall consult with any Indian tribe whose tribal lands are, or may be, flown over by a commercial air tour operator under a voluntary agreement under this paragraph. After such opportunity for public review and consultation, the voluntary agreement may be implemented without further administrative or environmental process beyond that described in this subsection.

(D) TERMINATION.—

(i) IN GENERAL.—A voluntary agreement under this paragraph may be terminated at any time at the discretion of—

(I) the Director, if the Director determines that the agreement is not adequately protecting park resources or visitor experiences; or

(II) the Administrator, if the Administrator determines that the agreement is adversely affecting aviation safety or the national aviation system.

(ii) EFFECT OF TERMINATION.—If a voluntary agreement with respect to a national park is terminated under this subparagraph, the operators shall conform to the requirements for interim operating authority under subsection (c) until an air tour management plan for the park is in effect.

(c) INTERIM OPERATING AUTHORITY.—

(1) IN GENERAL.—Upon application for operating authority, the Administrator shall grant interim operating authority under this subsection to a commercial air tour operator for commercial air tour operations over a national park or tribal lands for which the operator is an existing commercial air tour operator.

(2) REQUIREMENTS AND LIMITATIONS.—Interim operating authority granted under this subsection—

(A) shall provide annual authorization only for the greater of—

(i) the number of flights used by the operator to provide the commercial air tour operations over a national park within the 12-month period prior to the date of the enactment of this section; or

(ii) the average number of flights per 12-month period used by the operator to provide such operations within the 36-month period prior to such date of enactment, and, for seasonal operations, the number of flights so used during the season or seasons covered by that 12-month period;

(B) may not provide for an increase in the number of commercial air tour operations over a national park conducted during any time period by the commercial air tour operator above the number that the air tour operator was originally granted unless such an increase is agreed to by the Administrator and the Director;

(C) shall be published in the Federal Register to provide notice and opportunity for comment;

(D) may be revoked by the Administrator for cause;

(E) shall terminate 180 days after the date on which an air tour management plan is established for the park or tribal lands;

(F) shall promote protection of national park resources, visitor experiences, and tribal lands;

(G) shall promote safe commercial air tour operations;

(H) shall promote the adoption of quiet technology, as appropriate; and

(I) may allow for modifications of the interim operating authority without further environmental review beyond that described in this subsection, if—

(i) adequate information regarding the existing and proposed operations of the operator under the interim operating authority is provided to the Administrator and the Director;

(ii) the Administrator determines that there would be no adverse impact on aviation safety or the air traffic control system; and

(iii) the Director agrees with the modification, based on the professional expertise of the Director regarding the protection of the resources, values, and visitor use and enjoyment of the park.

(3) NEW ENTRANT AIR TOUR OPERATORS.—

(A) IN GENERAL.—The Administrator, in cooperation with the Director, may grant interim operating authority under this paragraph to an air tour operator for a national park or tribal lands for which that operator is a new entrant air tour operator without further environmental process beyond that described in this paragraph, if—

(i) adequate information on the proposed operations of the operator is provided to the Administrator and the Director by the operator making the request;

(ii) the Administrator agrees that there would be no adverse impact on aviation safety or the air traffic control system; and

(iii) the Director agrees, based on the Director's professional expertise regarding the protection of park resources and values and visitor use and enjoyment.

(B) SAFETY LIMITATION.—The Administrator may not grant interim operating authority under subparagraph (A) if the Administrator determines that it would create a safety problem at the park or on the tribal lands, or the Director determines that it would create a noise problem at the park or on the tribal lands.

(C) ATMP LIMITATION.—The Administrator may grant interim operating authority under subparagraph (A) of this paragraph only if the air tour management plan for the park or tribal lands to which the application relates has not been developed within 24 months after the date of the enactment of this section.

(d) COMMERCIAL AIR TOUR OPERATOR REPORTS.—

(1) REPORT.—Each commercial air tour operator conducting a commercial air tour oper-

ation over a national park under interim operating authority granted under subsection (c) or in accordance with an air tour management plan or voluntary agreement under subsection (b) shall submit to the Administrator and the Director a report regarding the number of commercial air tour operations over each national park that are conducted by the operator and such other information as the Administrator and Director may request in order to facilitate administering the provisions of this section.

(2) REPORT SUBMISSION.—Not later than 90 days after the date of enactment of the FAA Modernization and Reform Act of 2012, the Administrator and the Director shall jointly issue an initial request for reports under this subsection. The reports shall be submitted to the Administrator and the Director with a frequency and in a format prescribed by the Administrator and the Director.

(e) EXEMPTIONS.—This section shall not apply to—

(1) the Grand Canyon National Park; or

(2) tribal lands within or abutting the Grand Canyon National Park.

(f) LAKE MEAD.—This section shall not apply to any air tour operator while flying over or near the Lake Mead National Recreation Area, solely as a transportation route, to conduct an air tour over the Grand Canyon National Park. For purposes of this subsection, an air tour operator flying over the Hoover Dam in the Lake Mead National Recreation Area en route to the Grand Canyon National Park shall be deemed to be flying solely as a transportation route.

(g) DEFINITIONS.—In this section, the following definitions apply:

(1) COMMERCIAL AIR TOUR OPERATOR.—The term "commercial air tour operator" means any person who conducts a commercial air tour operation over a national park.

(2) EXISTING COMMERCIAL AIR TOUR OPERATOR.—The term "existing commercial air tour operator" means a commercial air tour operator that was actively engaged in the business of providing commercial air tour operations over a national park at any time during the 12-month period ending on the date of the enactment of this section.

(3) NEW ENTRANT COMMERCIAL AIR TOUR OPERATOR.—The term "new entrant commercial air tour operator" means a commercial air tour operator that—

(A) applies for operating authority as a commercial air tour operator for a national park or tribal lands; and

(B) has not engaged in the business of providing commercial air tour operations over the national park or tribal lands in the 12-month period preceding the application.

(4) COMMERCIAL AIR TOUR OPERATION OVER A NATIONAL PARK.—

(A) IN GENERAL.—The term "commercial air tour operation over a national park" means any flight, conducted for compensation or hire in a powered aircraft where a purpose of the flight is sightseeing over a national park, within ½ mile outside the boundary of any national park (except the Grand Canyon National Park), or over tribal lands (except those within or abutting the Grand Canyon National Park), during which the aircraft flies—

(i) below a minimum altitude, determined by the Administrator in cooperation with the Director, above ground level (except solely for purposes of takeoff or landing, or necessary for safe operation of an aircraft as determined under the rules and regulations of the Federal Aviation Administration requiring the pilot-in-command to take action to ensure the safe operation of the aircraft); or

(ii) less than 1 mile laterally from any geographic feature within the park (unless more than ½ mile outside the boundary).

(B) FACTORS TO CONSIDER.—In making a determination of whether a flight is a commercial air tour operation over a national park for purposes of this section, the Administrator may consider—

(i) whether there was a holding out to the public of willingness to conduct a sightseeing flight for compensation or hire;

(ii) whether a narrative that referred to areas or points of interest on the surface below the route of the flight was provided by the person offering the flight;

(iii) the area of operation;

(iv) the frequency of flights conducted by the person offering the flight;

(v) the route of flight;

(vi) the inclusion of sightseeing flights as part of any travel arrangement package offered by the person offering the flight;

(vii) whether the flight would have been canceled based on poor visibility of the surface below the route of the flight; and

(viii) any other factors that the Administrator and the Director consider appropriate.

(5) NATIONAL PARK.—The term "national park" means any unit of the National Park System.

(6) TRIBAL LANDS.—The term "tribal lands" means Indian country (as that term is defined in section 1151 of title 18) that is within or abutting a national park.

(7) ADMINISTRATOR.—The term "Administrator" means the Administrator of the Federal Aviation Administration.

(8) DIRECTOR.—The term "Director" means the Director of the National Park Service.

(Added Pub. L. 106–181, title VIII, § 803(a), Apr. 5, 2000, 114 Stat. 186; amended Pub. L. 108–176, title III, § 323(a), Dec. 12, 2003, 117 Stat. 2541; Pub. L. 109–115, div. A, title I, § 177, Nov. 30, 2005, 119 Stat. 2427; Pub. L. 112–95, title V, § 501, Feb. 14, 2012, 126 Stat. 100; Pub. L. 112–141, div. C, title V, § 35002, July 6, 2012, 126 Stat. 843.)

REFERENCES IN TEXT

The date of the enactment of this section, referred to in subsecs. (a)(4), (c)(2)(A), (3)(C), and (g)(2), is the date of enactment of Pub. L. 106–181, which was approved Apr. 5, 2000.

The date of enactment of the FAA Modernization and Reform Act of 2012, referred to in subsec. (d)(2), is the

date of enactment of Pub. L. 112–95, which was approved Feb. 14, 2012.

#### AMENDMENTS

2012—Subsec. (a)(1)(C). Pub. L. 112–95, §501(a), inserted "or voluntary agreement under subsection (b)(7)" before "for the park".

Subsec. (a)(5). Pub. L. 112–95, §501(b), added par. (5).

Subsec. (b)(1)(C). Pub. L. 112–141 amended subpar. (C) generally. Prior to amendment, text read as follows: "An application to begin commercial air tour operations at Crater Lake National Park may be denied without the establishment of an air tour management plan by the Director of the National Park Service if the Director determines that such operations would adversely affect park resources or visitor experiences."

Pub. L. 112–95, §501(c)(1), added subpar. (C).

Subsec. (b)(7). Pub. L. 112–95, §501(c)(2), added par. (7).

Subsec. (c)(2)(I). Pub. L. 112–95, §501(d)(1), added subpar. (I) and struck out former subpar. (I) which read as follows: "shall allow for modifications of the interim operating authority based on experience if the modification improves protection of national park resources and values and of tribal lands."

Subsec. (c)(3)(A). Pub. L. 112–95, §501(d)(2), substituted "without further environmental process beyond that described in this paragraph, if—" for "if the Administrator determines the authority is necessary to ensure competition in the provision of commercial air tour operations over the park or tribal lands." and added cls. (i) to (iii).

Subsecs. (d) to (g). Pub. L. 112–95, §501(e), added subsec. (d) and redesignated former subsecs. (d) to (f) as (e) to (g), respectively.

2005—Subsec. (e). Pub. L. 109–115 inserted at end "For purposes of this subsection, an air tour operator flying over the Hoover Dam in the Lake Mead National Recreation Area en route to the Grand Canyon National Park shall be deemed to be flying solely as a transportation route."

2003—Subsec. (a)(1). Pub. L. 108–176, §323(a)(1), inserted ", as defined by this section," after "tribal lands" in introductory provisions.

Subsec. (b)(3)(A). Pub. L. 108–176, §323(a)(2), inserted "over a national park" after "operations".

Subsec. (b)(3)(C). Pub. L. 108–176, §323(a)(3), inserted "over a national park that are also" after "operations".

Subsec. (b)(3)(D). Pub. L. 108–176, §323(a)(4), substituted "over a national park" for "at the park".

Subsec. (b)(3)(E). Pub. L. 108–176, §323(a)(5), inserted "over a national park" before "if the plan includes".

Subsec. (c)(2)(A)(i), (B). Pub. L. 108–176, §323(a)(6), inserted "over a national park" after "operations".

Subsec. (f)(1). Pub. L. 108–176, §323(a)(7), inserted "over a national park" after "operation".

Subsec. (f)(4). Pub. L. 108–176, §323(a)(10), inserted "OVER A NATIONAL PARK" after "OPERATION" in heading.

Subsec. (f)(4)(A). Pub. L. 108–176, §323(a)(8), in introductory provisions, substituted "commercial air tour operation over a national park" for "commercial air tour operation" and "park (except the Grand Canyon National Park), or over tribal lands (except those within or abutting the Grand Canyon National Park)," for "park, or over tribal lands,".

Subsec. (f)(4)(B). Pub. L. 108–176, §323(a)(9), inserted "over a national park" after "operation" in introductory provisions.

#### EFFECTIVE DATE OF 2012 AMENDMENT

Amendment by Pub. L. 112–141 effective Oct. 1, 2012, see section 3(a) of Pub. L. 112–141, set out as an Effective and Termination Dates of 2012 Amendment note under section 101 of Title 23, Highways.

#### EFFECTIVE DATE OF 2003 AMENDMENT

Amendment by Pub. L. 108–176 applicable only to fiscal years beginning after Sept. 30, 2003, except as otherwise specifically provided, see section 3 of Pub. L. 108–176, set out as a note under section 106 of this title.

#### EFFECTIVE DATE

Section applicable only to fiscal years beginning after Sept. 30, 1999, see section 3 of Pub. L. 106–181, set out as an Effective Date of 2000 Amendments note under section 106 of this title.

#### OVERFLIGHTS IN GRAND CANYON NATIONAL PARK

Pub. L. 112–141, div. C, title V, §35001, July 6, 2012, 126 Stat. 842, provided that:

"(a) DETERMINATIONS WITH RESPECT TO SUBSTANTIAL RESTORATION OF NATURAL QUIET AND EXPERIENCE.—

"(1) IN GENERAL.—Notwithstanding any other provision of law, for purposes of section 3(b)(1) of Public Law 100–91 ([former] 16 U.S.C. 1a–1 note [now set out below]), the substantial restoration of the natural quiet and experience of the Grand Canyon National Park (in this section referred to as the 'Park') shall be considered to be achieved in the Park if, for at least 75 percent of each day, 50 percent of the Park is free of sound produced by commercial air tour operations that have an allocation to conduct commercial air tours in the Park as of the date of enactment of this Act [see section 3(a), (b) of Pub. L. 112–141, set out as Effective and Termination Dates of 2012 Amendment notes under section 101 of Title 23, Highways].

"(2) CONSIDERATIONS.—

"(A) IN GENERAL.—For purposes of determining whether substantial restoration of the natural quiet and experience of the Park has been achieved in accordance with paragraph (1), the Secretary of the Interior (in this section referred to as the 'Secretary') shall use—

"(i) the 2-zone system for the Park in effect on the date of enactment of this Act to assess impacts relating to substantial restoration of natural quiet at the Park, including—

"(I) the thresholds for noticeability and audibility; and

"(II) the distribution of land between the 2 zones; and

"(ii) noise modeling science that is—

"(I) developed for use at the Park, specifically Integrated Noise Model Version 6.2;

"(II) validated by reasonable standards for conducting field observations of model results; and

"(III) accepted and validated by the Federal Interagency Committee on Aviation Noise.

"(B) SOUND FROM OTHER SOURCES.—The Secretary shall not consider sound produced by sources other than commercial air tour operations, including sound emitted by other types of aircraft operations or other noise sources, for purposes of—

"(i) making recommendations, developing a final plan, or issuing regulations relating to commercial air tour operations in the Park; or

"(ii) determining under paragraph (1) whether substantial restoration of the natural quiet and experience of the Park has been achieved.

"(3) CONTINUED MONITORING.—The Secretary shall continue monitoring noise from aircraft operating over the Park below 17,999 feet MSL to ensure continued compliance with the substantial restoration of natural quiet and experience of the Park.

"(4) DAY DEFINED.—For purposes of this section, the term 'day' means the hours between 7:00 a.m. and 7:00 p.m.

"(b) CONVERSION TO QUIET TECHNOLOGY AIRCRAFT.—

"(1) IN GENERAL.—Not later than 15 years after the date of enactment of this Act, all commercial air tour aircraft operating in the Grand Canyon National Park Special Flight Rules Area shall be required to fully convert to quiet aircraft technology (as determined in accordance with regulations in effect on the day before the date of enactment of this Act).

"(2) CONVERSION INCENTIVES.—Not later than 60 days after the date of enactment of this Act, the Secretary and the Administrator of the Federal Aviation

Administration shall provide incentives for commercial air tour operators that convert to quiet aircraft technology (as determined in accordance with the regulations in effect on the day before the date of enactment of this Act) before the date specified in paragraph (1), such as increasing the flight allocations for such operators on a net basis consistent with section 804(c) of the National Park[s] Air Tours [Tour] Management Act of 2000 (title VIII of Public Law 106–181) [set out below], provided that the cumulative impact of such operations does not increase noise at Grand Canyon National Park.''

GRAND CANYON OVERFLIGHT RULES

Pub. L. 109–115, div. A, title I, §177, Nov. 30, 2005, 119 Stat. 2427, provided in part that: ''Nothing in this provision [amending this section] shall allow exemption from overflight rules for the Grand Canyon.''

QUIET TECHNOLOGY RULEMAKING FOR AIR TOURS OVER GRAND CANYON NATIONAL PARK

Pub. L. 108–176, title III, §323(b), Dec. 12, 2003, 117 Stat. 2541, provided that:

''(1) DEADLINE FOR RULE.—No later than January 2005, the Secretary of Transportation shall issue a final rule to establish standards for quiet technology that are reasonably achievable at Grand Canyon National Park, based on the Supplemental Notice of Proposed Rulemaking on Noise Limitations for Aircraft Operations in the Vicinity of Grand Canyon National Park, published in the Federal Register on March 24, 2003.

''(2) RESOLUTION OF DISPUTES.—Subject to applicable administrative law and procedures, if the Secretary determines that a dispute among interested parties (including outside groups) or government agencies cannot be resolved within a reasonable time frame and could delay finalizing the rulemaking described in subsection (a), or implementation of final standards under such rule, due to controversy over adoption of quiet technology routes, establishment of incentives to encourage adoption of such routes, establishment of incentives to encourage adoption of quite technology, or other measures to achieve substantial restoration of natural quiet, the Secretary shall refer such dispute to a recognized center for environmental conflict resolution.''

NATIONAL PARKS AIR TOUR MANAGEMENT

Pub. L. 106–181, title VIII, Apr. 5, 2000, 114 Stat. 185, as amended by Pub. L. 106–528, §8(b), Nov. 22, 2000, 114 Stat. 2522, provided that:

''SEC. 801. SHORT TITLE.

''This title may be cited as the 'National Parks Air Tour Management Act of 2000'.

''SEC. 802. FINDINGS.

''Congress finds that—

''(1) the Federal Aviation Administration has sole authority to control airspace over the United States;

''(2) the Federal Aviation Administration has the authority to preserve, protect, and enhance the environment by minimizing, mitigating, or preventing the adverse effects of aircraft overflights on public and tribal lands;

''(3) the National Park Service has the responsibility of conserving the scenery and natural and historic objects and wildlife in national parks and of providing for the enjoyment of the national parks in ways that leave the national parks unimpaired for future generations;

''(4) the protection of tribal lands from aircraft overflights is consistent with protecting the public health and welfare and is essential to the maintenance of the natural and cultural resources of Indian tribes;

''(5) the National Parks Overflights Working Group, composed of general aviation, commercial air tour, environmental, and Native American representatives, recommended that the Congress enact legislation based on the Group's consensus work product; and

''(6) this title reflects the recommendations made by that Group.

''SEC. 803. AIR TOUR MANAGEMENT PLANS FOR NATIONAL PARKS.

''(a) IN GENERAL.—[Enacted this section.]

''(b) CONFORMING AMENDMENT.—[Amended analysis for chapter 401 of this title.]

''(c) COMPLIANCE WITH OTHER REGULATIONS.—For purposes of section 40128 of title 49, United States Code—

''(1) regulations issued by the Secretary of Transportation and the Administrator [of the Federal Aviation Administration] under section 3 of Public Law 100-91 ([former] 16 U.S.C. 1a–1 note [now set out below]); and

''(2) commercial air tour operations carried out in compliance with the requirements of those regulations,

shall be deemed to meet the requirements of such section 40128.

''SEC. 804. QUIET AIRCRAFT TECHNOLOGY FOR GRAND CANYON.

''(a) QUIET TECHNOLOGY REQUIREMENTS.—Within 12 months after the date of the enactment of this Act [Apr. 5, 2000], the Administrator shall designate reasonably achievable requirements for fixed-wing and helicopter aircraft necessary for such aircraft to be considered as employing quiet aircraft technology for purposes of this section. If the Administrator determines that the Administrator will not be able to make such designation before the last day of such 12-month period, the Administrator shall transmit to Congress a report on the reasons for not meeting such time period and the expected date of such designation.

''(b) ROUTES OR CORRIDORS.—In consultation with the Director and the advisory group established under section 805, the Administrator shall establish, by rule, routes or corridors for commercial air tour operations (as defined in section 40128(f) of title 49, United States Code) by fixed-wing and helicopter aircraft that employ quiet aircraft technology for—

''(1) tours of the Grand Canyon originating in Clark County, Nevada; and

''(2) 'local loop' tours originating at the Grand Canyon National Park Airport, in Tusayan, Arizona,

provided that such routes or corridors can be located in areas that will not negatively impact the substantial restoration of natural quiet, tribal lands, or safety.

''(c) OPERATIONAL CAPS.—Commercial air tour operations by any fixed-wing or helicopter aircraft that employs quiet aircraft technology and that replaces an existing aircraft shall not be subject to the operational flight allocations that apply to other commercial air tour operations of the Grand Canyon, provided that the cumulative impact of such operations does not increase noise at the Grand Canyon.

''(d) MODIFICATION OF EXISTING AIRCRAFT TO MEET STANDARDS.—A commercial air tour operation by a fixed-wing or helicopter aircraft in a commercial air tour operator's fleet on the date of the enactment of this Act [Apr. 5, 2000] that meets the requirements designated under subsection (a), or is subsequently modified to meet the requirements designated under subsection (a), may be used for commercial air tour operations under the same terms and conditions as a replacement aircraft under subsection (c) without regard to whether it replaces an existing aircraft.

''(e) MANDATE TO RESTORE NATURAL QUIET.—Nothing in this Act [should be ''this title''] shall be construed to relieve or diminish—

''(1) the statutory mandate imposed upon the Secretary of the Interior and the Administrator of the Federal Aviation Administration under Public Law 100-91 ([former] 16 U.S.C. 1a–1 note [now set out below]) to achieve the substantial restoration of the natural quiet and experience at the Grand Canyon National Park; and

''(2) the obligations of the Secretary and the Administrator to promulgate forthwith regulations to achieve the substantial restoration of the natural

quiet and experience at the Grand Canyon National Park.

"SEC. 805. ADVISORY GROUP.

"(a) ESTABLISHMENT.—Not later than 1 year after the date of the enactment of this Act [Apr. 5, 2000], the Administrator [of the Federal Aviation Administration] and the Director of the National Park Service shall jointly establish an advisory group to provide continuing advice and counsel with respect to commercial air tour operations over and near national parks.

"(b) MEMBERSHIP.—

"(1) IN GENERAL.—The advisory group shall be composed of—

"(A) a balanced group of—

"(i) representatives of general aviation;

"(ii) representatives of commercial air tour operators;

"(iii) representatives of environmental concerns; and

"(iv) representatives of Indian tribes;

"(B) a representative of the Federal Aviation Administration; and

"(C) a representative of the National Park Service.

"(2) EX OFFICIO MEMBERS.—The Administrator (or the designee of the Administrator) and the Director (or the designee of the Director) shall serve as ex officio members.

"(3) CHAIRPERSON.—The representative of the Federal Aviation Administration and the representative of the National Park Service shall serve alternating 1-year terms as chairman of the advisory group, with the representative of the Federal Aviation Administration serving initially until the end of the calendar year following the year in which the advisory group is first appointed.

"(c) DUTIES.—The advisory group shall provide advice, information, and recommendations to the Administrator and the Director—

"(1) on the implementation of this title and the amendments made by this title;

"(2) on commonly accepted quiet aircraft technology for use in commercial air tour operations over a national park or tribal lands, which will receive preferential treatment in a given air tour management plan;

"(3) on other measures that might be taken to accommodate the interests of visitors to national parks; and

"(4) at the request of the Administrator and the Director, safety, environmental, and other issues related to commercial air tour operations over a national park or tribal lands.

"(d) COMPENSATION; SUPPORT; FACA.—

"(1) COMPENSATION AND TRAVEL.—Members of the advisory group who are not officers or employees of the United States, while attending conferences or meetings of the group or otherwise engaged in its business, or while serving away from their homes or regular places of business, may be allowed travel expenses, including per diem in lieu of subsistence, as authorized by section 5703 of title 5, United States Code, for persons in the Government service employed intermittently.

"(2) ADMINISTRATIVE SUPPORT.—The Federal Aviation Administration and the National Park Service shall jointly furnish to the advisory group clerical and other assistance.

"(3) NONAPPLICATION OF FACA.—Section 14 of the Federal Advisory Committee Act (5 U.S.C. App.) does not apply to the advisory group.

"SEC. 806. PROHIBITION OF COMMERCIAL AIR TOUR OPERATIONS OVER THE ROCKY MOUNTAIN NATIONAL PARK.

"Effective beginning on the date of the enactment of this Act [Apr. 5, 2000], no commercial air tour operation may be conducted in the airspace over the Rocky Mountain National Park notwithstanding any other provision of this Act or section 40128 of title 49, United States Code.

"SEC. 807. REPORTS.

"(a) OVERFLIGHT FEE REPORT.—Not later than 180 days after the date of the enactment of this Act [Apr. 5, 2000], the Administrator [of the Federal Aviation Administration] shall transmit to Congress a report on the effects overflight fees are likely to have on the commercial air tour operation industry. The report shall include, but shall not be limited to—

"(1) the viability of a tax credit for the commercial air tour operators equal to the amount of any overflight fees charged by the National Park Service; and

"(2) the financial effects proposed offsets are likely to have on Federal Aviation Administration budgets and appropriations.

"(b) QUIET AIRCRAFT TECHNOLOGY REPORT.—Not later than 2 years after the date of the enactment of this Act, the Administrator and the Director of the National Park Service shall jointly transmit a report to Congress on the effectiveness of this title in providing incentives for the development and use of quiet aircraft technology.

"SEC. 808. METHODOLOGIES USED TO ASSESS AIR TOUR NOISE.

"Any methodology adopted by a Federal agency to assess air tour noise in any unit of the national park system (including the Grand Canyon and Alaska) shall be based on reasonable scientific methods.

"SEC. 809. ALASKA EXEMPTION.

"The provisions of this title and section 40128 of title 49, United States Code, as added by section 803(a), do not apply to any land or waters located in Alaska."

STUDY TO DETERMINE APPROPRIATE MINIMUM ALTITUDE FOR AIRCRAFT FLYING OVER NATIONAL PARK SYSTEM UNITS

Pub. L. 100–91, Aug. 18, 1987, 101 Stat. 674, as amended by Pub. L. 106–510, §3(a)(2), (b)(2), Nov. 13, 2000, 114 Stat. 2363, provided that:

"SECTION 1. STUDY OF PARK OVERFLIGHTS.

"(a) STUDY BY PARK SERVICE.—The Secretary of the Interior (hereinafter referred to as the 'Secretary'), acting through the Director of the National Park Service, shall conduct a study to determine the proper minimum altitude which should be maintained by aircraft when flying over units of the National Park System. The Secretary of Transportation, acting through the Administrator of the Federal Aviation Administration (hereinafter referred to as the 'Administrator'), shall provide technical assistance to the Secretary in carrying out the study.

"(b) GENERAL REQUIREMENTS OF STUDY.—The study shall identify any problems associated with overflight by aircraft of units of the National Park System and shall provide information regarding the types of overflight which may be impacting on park unit resources. The study shall distinguish between the impacts caused by sightseeing aircraft, military aircraft, commercial aviation, general aviation, and other forms of aircraft which affect such units. The study shall identify those park system units, and portions thereof, in which the most serious adverse impacts from aircraft overflights exist.

"(c) SPECIFIC REQUIREMENTS.—The study under this section shall include research at the following units of the National Park System: Cumberland Island National Seashore, Yosemite National Park, Hawai'i Volcanoes National Park, Haleakalā National Park, Glacier National Park, and Mount Rushmore National Memorial, and at no less than four additional units of the National Park System, excluding all National Park System units in the State of Alaska. The research at each such unit shall provide information and an evaluation regarding each of the following:

"(1) the impacts of aircraft noise on the safety of the park system users, including hikers, rock-climbers, and boaters;

"(2) the impairment of visitor enjoyment associated with flights over such units of the National Park System;

''(3) other injurious effects of overflights on the natural, historical, and cultural resources for which such units were established; and

''(4) the values associated with aircraft flights over such units of the National Park System in terms of visitor enjoyment, the protection of persons or property, search and rescue operations and firefighting.

Such research shall evaluate the impact of overflights by both fixed-wing aircraft and helicopters. The research shall include an evaluation of the differences in noise levels within such units of the National Park System which are associated with flight by commonly used aircraft at different altitudes. The research shall apply only to overflights and shall not apply to landing fields within, or adjacent to, such units.

''(d) REPORT TO CONGRESS.—The Secretary shall submit a report to the Congress within 3 years after the enactment of this Act [Aug. 18, 1987] containing the results of the study carried out under this section. Such report shall also contain recommendations for legislative and regulatory action which could be taken regarding the information gathered pursuant to paragraphs (1) through (4) of subsection (c). Before submission to the Congress, the Secretary shall provide a draft of the report and recommendations to the Administrator for review. The Administrator shall review such report and recommendations and notify the Secretary of any adverse effects which the implementation of such recommendations would have on the safety of aircraft operations. The Administrator shall consult with the Secretary to resolve issues relating to such adverse effects. The final report shall include a finding by the Administrator that implementation of the recommendations of the Secretary will not have adverse effects on the safety of aircraft operations, or if the Administrator is unable to make such finding, a statement by the Administrator of the reasons he believes the Secretary's recommendations will have an adverse effect on the safety of aircraft operations.

''(e) FAA REVIEW OF RULES.—The Administrator shall review current rules and regulations pertaining to flights of aircraft over units of the National Park System at which research is conducted under subsection (c) and over any other such units at which such a review is determined necessary by the Administrator or is requested by the Secretary. In the review under this subsection, the Administrator shall determine whether changes are needed in such rules and regulations on the basis of aviation safety. Not later than 180 days after the identification of the units of the National Park System for which research is to be conducted under subsection (c), the Administrator shall submit a report to Congress containing the results of the review along with recommendations for legislative and regulatory action which are needed to implement any such changes.

''(f) AUTHORIZATION.—There are authorized to be appropriated such sums as may be necessary to carry out the studies and review under this section.

''SEC. 2. FLIGHTS OVER YOSEMITE AND HALEAKALĀ DURING STUDY AND REVIEW.

''(a) YOSEMITE NATIONAL PARK.—During the study and review periods provided in subsection (c), it shall be unlawful for any fixed wing aircraft or helicopter flying under visual flight rules to fly at an altitude of less than 2,000 feet over the surface of Yosemite National Park. For purposes of this subsection, the term 'surface' refers to the highest terrain within the park which is within 2,000 feet laterally of the route of flight and with respect to Yosemite Valley such term refers to the upper-most rim of the valley.

''(b) HALEAKALĀ NATIONAL PARK.—During the study and review periods provided in subsection (c), it shall be unlawful for any fixed wing aircraft or helicopter flying under visual flight rules to fly at an altitude below 9,500 feet above mean sea level over the surface of any of the following areas in Haleakalā National Park: Haleakala Crater, Crater Cabins, the Scientific Research Reserve, Halemauu Trail, Kaupo Gap Trail, or any designated tourist viewpoint.

''(c) STUDY AND REVIEW PERIODS.—For purposes of subsections (a) and (b), the study period shall be the period of the time after the date of enactment of this Act [Aug. 18, 1987] and prior to the submission of the report under section 1. The review period shall comprise a 2-year period for Congressional review after the submission of the report to Congress.

''(d) EXCEPTIONS.—The prohibitions contained in subsections (a) and (b) shall not apply to any of the following:

''(1) emergency situations involving the protection of persons or property, including aircraft;

''(2) search and rescue operations;

''(3) flights for purposes of firefighting or for required administrative purposes; and

''(4) compliance with instructions of an air traffic controller.

''(e) ENFORCEMENT.—For purposes of enforcement, the prohibitions contained in subsections (a) and (b) shall be treated as requirements established pursuant to section 307 of the Federal Aviation Act of 1958 [see 49 U.S.C. 40103(b)]. To provide information to pilots regarding the restrictions established under this Act, the Administrator shall provide public notice of such restrictions in appropriate Federal Aviation Administration publications as soon as practicable after the enactment of this Act [Aug. 18, 1987].

''SEC. 3. GRAND CANYON NATIONAL PARK.

''(a) Noise associated with aircraft overflights at the Grand Canyon National Park is causing a significant adverse effect on the natural quiet and experience of the park and current aircraft operations at the Grand Canyon National Park have raised serious concerns regarding public safety, including concerns regarding the safety of park users.

''(b) RECOMMENDATIONS.—

''(1) SUBMISSION.—Within 30 days after the enactment of this Act [Aug. 18, 1987], the Secretary shall submit to the Administrator recommendations regarding actions necessary for the protection of resources in the Grand Canyon from adverse impacts associated with aircraft overflights. The recommendations shall provide for substantial restoration of the natural quiet and experience of the park and protection of public health and safety from adverse effects associated with aircraft overflights. Except as provided in subsection (c), the recommendations shall contain provisions prohibiting the flight of aircraft below the rim of the Canyon, and shall designate flight free zones. Such zones shall be flight free except for purposes of administration and for emergency operations, including those required for the transportation of persons and supplies to and from Supai Village and the lands of the Havasupai Indian Tribe of Arizona. The Administrator, after consultation with the Secretary, shall define the rim of the Canyon in a manner consistent with the purposes of this paragraph.

''(2) IMPLEMENTATION.—Not later than 90 days after receipt of the recommendations under paragraph (1) and after notice and opportunity for hearing, the Administrator shall prepare and issue a final plan for the management of air traffic in the air space above the Grand Canyon. The plan shall, by appropriate regulation, implement the recommendations of the Secretary without change unless the Administrator determines that implementing the recommendations would adversely affect aviation safety. If the Administrator determines that implementing the recommendations would adversely affect aviation safety, he shall, not later than 60 days after making such determination, in consultation with the Secretary and after notice and opportunity for hearing, review the recommendations consistent with the requirements of paragraph (1) to eliminate the adverse effects on aviation safety and issue regulations implementing the revised recommendations in the plan. In addition to the Administrator's authority to implement such regulations under the Federal Aviation Act of 1958

[see 49 U.S.C. 40101 et seq.], the Secretary may enforce the appropriate requirements of the plan under such rules and regulations applicable to the units of the National Park System as he deems appropriate.

''(3) REPORT.—Within 2 years after the effective date of the plan required by subsection (b)(2), the Secretary shall submit to the Congress a report discussing—

''(A) whether the plan has succeeded in substantially restoring the natural quiet in the park; and

''(B) such other matters, including possible revisions in the plan, as may be of interest.

The report shall include comments by the Administrator regarding the effect of the plan's implementation on aircraft safety.

''(c) HELICOPTER FLIGHTS OF RIVER RUNNERS.—Subsection (b) shall not prohibit the flight of helicopters—

''(1) which fly a direct route between a point on the north rim outside of the Grand Canyon National Park and locations on the Hualapai Indian Reservation (as designated by the Tribe); and

''(2) whose sole purpose is transporting individuals to or from boat trips on the Colorado River and any guide of such a trip.

''SEC. 4. BOUNDARY WATERS CANOE AREA WILDERNESS.

''The Administrator shall conduct surveillance of aircraft flights over the Boundary Waters Canoe Area Wilderness as authorized by the Act of October 21, 1978 (92 Stat. 1649–1659) for a period of not less than 180 days beginning within 60 days of enactment of this Act [Aug. 18, 1987]. In addition to any actions the Administrator may take as a result of such surveillance, he shall provide a report to the Committee on Interior and Insular Affairs and the Committee on Public Works and Transportation of the United States House of Representatives and to the Committee on Energy and Natural Resources and the Committee on Commerce, Science, and Transportation of the United States Senate. Such report is to be submitted within 30 days of completion of the surveillance activities. Such report shall include but not necessarily be limited to information on the type and frequency of aircraft using the airspace over the Boundary Waters Canoe Area Wilderness.

''SEC. 5. ASSESSMENT OF NATIONAL FOREST SYSTEM WILDERNESS OVERFLIGHTS.

''(a) ASSESSMENT BY FOREST SERVICE.—The Chief of the Forest Service (hereinafter referred to as the 'Chief') shall conduct an assessment to determine what, if any, adverse impacts to wilderness resources are associated with overflights of National Forest System wilderness areas. The Administrator of the Federal Aviation Administration shall provide technical assistance to the Chief in carrying out the assessment. Such assessment shall apply only to overflight of wilderness areas and shall not apply to aircraft flights or landings adjacent to National Forest System wilderness units. The assessment shall not apply to any National Forest System wilderness units in the State of Alaska.

''(b) REPORT TO CONGRESS.—The Chief shall submit a report to Congress within 2 years after enactment of this Act [Aug. 18, 1987] containing the results of the assessments carried out under this section.

''(c) AUTHORIZATION.—Effective October 1, 1987, there are authorized to be appropriated such sums as may be necessary to carry out the assessment under this section.

''SEC. 6. CONSULTATION WITH FEDERAL AGENCIES.

''In conducting the study and the assessment required by this Act, the Secretary of the Interior and the Chief of the Forest Service shall consult with other Federal agencies that are engaged in an analysis of the impacts of aircraft overflights over federally-owned land.''

## §40129. Collaborative decisionmaking pilot program

(a) ESTABLISHMENT.—Not later than 90 days after the date of enactment of this section, the Administrator of the Federal Aviation Administration shall establish a collaborative decisionmaking pilot program in accordance with this section.

(b) DURATION.—Except as provided in subsection (k), the pilot program shall be in effect for a period of 2 years.

(c) GUIDELINES.—

(1) ISSUANCE.—The Administrator, with the concurrence of the Attorney General, shall issue guidelines concerning the pilot program. Such guidelines, at a minimum, shall—

(A) define a capacity reduction event;

(B) establish the criteria and process for determining when a capacity reduction event exists that warrants the use of collaborative decisionmaking among carriers at airports participating in the pilot program; and

(C) prescribe the methods of communication to be implemented among carriers during such an event.

(2) VIEWS.—The Administrator may obtain the views of interested parties in issuing the guidelines.

(d) EFFECT OF DETERMINATION OF EXISTENCE OF CAPACITY REDUCTION EVENT.—Upon a determination by the Administrator that a capacity reduction event exists, the Administrator may authorize air carriers and foreign air carriers operating at an airport participating in the pilot program to communicate for a period of time not to exceed 24 hours with each other concerning changes in their respective flight schedules in order to use air traffic capacity most effectively. The Administration shall facilitate and monitor such communication. The Attorney General, or the Attorney General's designee, may monitor such communication.

(e) SELECTION OF PARTICIPATING AIRPORTS.— Not later than 30 days after the date on which the Administrator establishes the pilot program, the Administrator shall select 2 airports to participate in the pilot program from among the most capacity-constrained airports in the Nation based on the Administration's Airport Capacity Benchmark Report 2001 or more recent data on airport capacity that is available to the Administrator. The Administrator shall select an airport for participation in the pilot program if the Administrator determines that collaborative decisionmaking among air carriers and foreign air carriers would reduce delays at the airport and have beneficial effects on reducing delays in the national airspace system as a whole.

(f) ELIGIBILITY OF AIR CARRIERS.—An air carrier or foreign air carrier operating at an airport selected to participate in the pilot program is eligible to participate in the pilot program if the Administrator determines that the carrier has the operational and communications capability to participate in the pilot program.

(g) MODIFICATION OR TERMINATION OF PILOT PROGRAM AT AN AIRPORT.—The Administrator, with the concurrence of the Attorney General, may modify or end the pilot program at an airport before the term of the pilot program has expired, or may ban an air carrier or foreign air carrier from participating in the program, if the